ASSOCIATED FILM DISTRIBUTION CORPORATION, et al.

v.

The Honorable Dick THORNBURGH, et al.

Civ. A. No. 80–1179.

United States District Court, E. D. Pennsylvania.

Aug. 24, 1981.

973

George P. Williams, III, Philadelphia, Pa.,
for plaintiffs.

Allen C. Warshaw, Deputy Atty. Gen.,
Com. of Pa., Harrisburg, Pa., for Thorn-
burgh and Biester.

Peter M. Fishbein, New York City, Rich-
ard M. Squire, Philadelphia, Pa., for Fox
Theatre.

H. Donald Busch, Philadelphia, Pa., for
Budco.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

The Pennsylvania Feature Motion Picture
Fair Business Practices Law, Act No. 1980–
14, 73 P.S. § 203–1 et seq. ("the Act"), was
approved by Governor Thornburgh on Feb-
ruary 29, 1980, and became effective on
April 29, 1980. The Act comprehensively
regulates the licensing of motion pictures
for exhibition within the Commonwealth of
Pennsylvania.

A number of other states have adopted
legislation regulating certain aspects of mo-
tion picture licensing.[1] Most of the statutes
that have been enacted in states other than
Pennsylvania go no further than prohibit-
ing the licensing of motion pictures without
an advance trade screening (thereby prohib-
iting a practice referred to in the Act as
"blind bidding").[2] A few, such as Sections
1333.05 through 1333.07 of the Revised Code
of Ohio, effective October 23, 1978 ("the
Ohio statute"), regulate other licensing
practices such as "guarantees," "advances,"
and bidding procedures.[3] The Pennsylvania
Act contains additional provisions, such as
Section 7, 73 P.S. § 203–7, regulating "ex-
clusive first runs,"[4] and is more far-reach-
ing than even the Ohio statute.

On March 24, 1980, plaintiffs, who include
many of the major distributors and produc-
ers of motion pictures, initiated the present
action. They ask that the Act be declared
unconstitutional and that its enforcement
be permanently enjoined. In their com-
plaint, plaintiffs assert that the Act violates
the Supremacy Clause, Article VI, cl. 2, the
Commerce Clause, Article I, § 8, cl. 3, and
the First, Fifth and Fourteenth Amend-
ments to the United States Constitution, as
well as Article I, § 7 and Article III, § 32 of
the Constitution of the Commonwealth of
Pennsylvania. Named as defendants are
the Governor and Attorney General of the
Commonwealth of Pennsylvania (who, by
virtue of their offices, are charged with the
execution and the enforcement of the laws
of the Commonwealth), and two "exhibi-
tors" as defined in § 3 of the Act, 73 P.S.
§ 203–3, Budco Quality Theatres, Inc.
("Budco") and Fox Theatres Management
Corporation ("Fox").[5] The exhibitor de-
fendants operate two of the major theatre

---

1. *See* Affidavit of Richard A. Fox, President,
Fox Theatres Management Corporation ("Fox
Affidavit") ¶ 16; Exhibit "B" to Answer of
Budco Quality Theatres, Inc.

2. *See Allied Artists Pictures Corp. v. Rhodes*,
496 F.Supp. 408, 437 (S.D.Ohio 1980), where
District Judge Duncan observed that the other
state regulatory statutes enacted as of the time
of trial " 'basically prohibit blind bidding.' " In
*Allied Artists*, Judge Duncan rejected an attack
brought by many of the same plaintiffs upon
the constitutionality of the Ohio statute. That
decision is presently on appeal to the United
States Court of Appeals for the Sixth Circuit
(No. 80–3566).

3. *See* Fox Affidavit, ¶ 16.

4. Section 3 of the Pennsylvania Act defines a
"run" as "[t]he continuous exhibition of a fea-
ture motion picture for a specified period of
time." A "first run" is the first exhibition of a
feature motion picture in the designated area
and an "exclusive run" is "any run limited to a
single theatre in a defined geographical area."

5. The powers of the Governor and Attorney
General are more fully set forth in Article 4, § 2
of the Constitution of the Commonwealth and
71 P.S. § 61 *et seq.* and 71 P.S. § 732–204.

Section 3 of the Act, 73 P.S. § 203–3, defines
an "exhibitor" as "[a]ny person engaged in the
business of operating one or more theatres in
this Commonwealth..." and a "distributor" as
"[a]ny person engaged in the business of rent-
ing, selling or licensing feature motion pictures
to exhibitors."

circuits or chains in this region.[6] All defendants filed answers to the complaint.[7]

On July 15, 1980 plaintiffs filed the present motion for summary judgment, accompanied by affidavits, asking that the Act be declared unconstitutional on its face.[8] Defendants' responsive memoranda are also supported by affidavits.[9] Oral argument was heard on March 27, 1981, and the motion is ripe for decision.

Stripped to the essentials, the issues before this Court are, *first,* whether the Act's regulation of the licensing process through which copyrighted motion pictures are made available to the theatre-going public violates the First Amendment and the Supremacy Clause; and, *second,* whether any material fact issues exist that would bar that determination on motion for summary judgment.[10] Careful review of the pleadings, the affidavits, and the extensive and thorough briefs submitted by the parties demonstrates that plaintiffs' First Amendment and Supremacy Clause claims may be decided on this motion and that the Act conflicts on its face with rights protected by those constitutional provisions.

## I.

### THE PROVISIONS OF THE ACT.

The Act directly regulates the licensing process through which copyrighted motion pictures, and the ideas they express, are made available to theatre audiences, prohibits certain terms in license agreements between distributors of motion pictures and exhibitors, and requires that certain procedures be followed.[11] There exist both obvi-

6. Budco operates 55 theatres with 99 screens in Eastern Pennsylvania, Maryland, Delaware, and Southern New Jersey, and Fox operates 28 theatres with 48 screens in Pennsylvania, Maryland, and Delaware. Fox Affidavit, ¶ 1; Affidavit of Claude J. Schlanger ("Schlanger Affidavit"), ¶ 1.

7. With its answer, defendant Budco counterclaimed against plaintiffs, alleging violations of § 1 of the Sherman Act. By agreement of the parties, plaintiffs have not answered the counterclaim. Plaintiffs filed a motion for severance of the counterclaim or, in the alternative, for a separate trial and a stay of all proceedings in connection with it. Together with its answer, Budco also demanded a trial of the entire case by jury, both the declaratory action and counterclaim, and plaintiffs have moved to strike that demand.

The exhibitor defendants have served all plaintiffs with interrogatories and requests for production of documents relating both to the case-in-chief and to the counterclaim. The discovery sought by Fox has been stayed by court-approved stipulation. A motion for protective order with regard to Budco's discovery requests is presently before this Court, as is an appeal from Magistrate Powers' order of September 22, 1980 denying plaintiffs' earlier motion for a protective order limiting discovery to the issues raised by this motion.

8. Plaintiffs' motion for summary judgment was accompanied by the affidavits of Leo Greenfield, Vice President for Marketing and Distribution, Associated Film Distribution Corporation ("Greenfield Affidavit") and Norman Levy, President of 20th Century Fox Entertainment, a division of 20th Century Fox Film Corporation ("Levy Affidavit").

9. Defendants submitted the Fox and Schlanger affidavits.

10. Decision of the First Amendment issues disposes of this motion. Defendants have basically and substantially conceded that plaintiffs' Supremacy Clause and copyright claim may be decided as a matter of law. Because of the importance of the question whether the Act's regulation of licensing motion pictures for exhibition impermissibly interferes with federal copyright regulation, it is also discussed in this opinion. Plaintiffs' claims under the Due Process clause and the Pennsylvania Constitution need not be decided because the foregoing is dispositive. As to the Commerce Clause issues, additional facts are necessary for their determination under the "balancing" test of *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

11. Motion pictures are copyrighted forms of creative expression. They are marketed by means of copyright licenses extended by distributors of films, located in states other than Pennsylvania, to local exhibitors. *See* Levy Affidavit, ¶¶ 2–3, 6; Greenfield Affidavit, ¶¶ 2, 4–5. As a result of the landmark Supreme Court decision in *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), and the subsequent divestiture order in *United States v. Paramount Pictures, Inc.,* 85 F.Supp. 881 (S.D.N.Y.1949), aff'd sub nom. *Loew's Inc. v. United States,* 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (1950), motion picture distributors own and operate no theatres at which motion pictures are exhibited, in Pennsylvania or elsewhere. *See* Budco Answer, ¶ 4. They achieve access to their theatre

ous similarities to and differences from the provisions of the Ohio statute.

Section 2 of the Act sets forth the sole legislative finding, namely, that "the licensing and distribution of feature motion pictures to theatres in this Commonwealth, including the rights and obligations of distributors and exhibitors, vitally affects the general economy as well as the access of the public to works of artistic expression and opinion. . . ." and asserts that regulation of licensing and relationships between motion picture distributors and exhibitors is a valid exercise of the police power. Ten purposes purportedly served by the Act are also listed in that section.[12] The Ohio statute contains no statement of any finding or purposes.

Section 3 defines the terms used in the Act. Its definitions closely resemble the definitions used in the Ohio statute.

Section 4 absolutely prohibits negotiating for, bidding for, or agreeing to a license for the exhibition of a motion picture within Pennsylvania without a prior trade screening within the Commonwealth (that is, it prohibits "blind bidding"). The Ohio statute has the identical practical effect.[13] An important effect of this prohibition is that no negotiation for a license agreement between a distributor and an exhibitor may begin until the picture is in final form for exhibition. Although Section 4 requires a trade screening to take place, it does not require exhibitors to attend a trade screening. Like other sections of the Act, Section 4 may not be waived. The Ohio statute also prohibits any waiver of the comparable section.

Section 5 absolutely prohibits all guarantees of minimum film rental when a license agreement provides for payment to the distributor based in whole or in part on a percentage of attendance or box office receipts.[14] No such license agreement may be

audiences through theatres operated by such exhibitors.

Both before the Pennsylvania Act was passed and at the present time, distributors offer, and exhibitors bid or negotiate for, licenses to exhibit motion pictures within regional or metropolitan marketing areas. Levy and Greenfield Affidavits, ¶¶ 9, 23. Revenues from the licensing of copyrighted motion pictures constitute a significant portion of the return received by the distributors. The terms of a copyright license are the means by which the distributor and exhibitor apportion the risks and returns from exhibition of motion pictures. *See* Levy and Greenfield Affidavits, §§ 5, 7, 8, 27; Fox Affidavit, ¶¶ 3, 7.

12. These purposes, as stated, are:

"(1) [to] insure unabridged access for the public to artistic expression and opinion in feature motion pictures at reasonable prices and at many different locations;

"(2) [to] avoid undue control of the exhibitors by the distributors;

"(3) [to] foster vigorous and healthy competition in offering feature motion pictures for the benefit of the public by prohibiting practices through which fair and honest competition is restrained, destroyed or inhibited;

"(4) [to] promote the wide geographical dissemination at reasonable prices to the public of ideas, opinions and artistic expression in feature motion pictures;

"(5) [to] prevent delay in the exhibition of feature motion pictures to the public in theatres playing subsequent to the first run showing;

"(6) [to] prevent theatres from unnecessarily going out of business, thereby resulting in reducing the number of small independent businesses and unemployment with loss of tax revenues and other undesirable consequences;

"(7) [to] prevent unfair deceptive acts or practices and unreasonable restraints of trade in the business of distribution and exhibition of feature motion pictures within the Commonwealth;

"(8) [to] promote fair and effective competition in that business;

"(9) [to] benefit the movie going public by limiting the long and extensive first runs so that additional theatres, in a given area, may also exhibit the same feature motion picture and at possibly a lower admission price; and

"(10) [to] prohibit blind bidding by insuring that exhibitors have the opportunity to view a motion picture and know the contents before committing themselves to exhibit it in their communities."

13. Sections 1333.06(A) and 1333.07(B), (C) of the Ohio statute say that distributors may not engage in "blind bidding," and that they must notify invited bidders of scheduled trade screenings. Ohio includes "negotiation . . . prior to a trade screening . . ." in its definition of "blind bidding." § 1333.05(I).

14. The "percentage of gross receipts" represents the percentage figure of the box office receipts that the distributor would receive as rental. This was, and still is, the most common

conditioned upon or contain any guarantee. By contrast, the Ohio statute, § 1333.06(B), only prohibits a distributor from *demanding* that a license agreement contain a guarantee of a minimum payment. Although Section 5 prohibits a guarantee in the case of a percentage rental, it does not prohibit a flat rental, nor does it prohibit a guarantee with a flat rental. Section 5 also provides that provisions for any such guarantees are void and that any purported waiver of the prohibition is void.

Section 6 of the Act prohibits any and all advance payments of film rentals by an exhibitor to a distributor.[15] A license agreement may not provide for any advance payment prior to exhibition of a motion picture, either as security for performance of the license agreement or as an advance on rental payments due under the agreement. The Ohio statute, § 1333.06(C) only prohibits a distributor from requiring a license that provides for an exhibitor's advancing any money for security or as an advance payment on rental due more than 14 days prior to exhibition of a motion picture. Like Section 5, Section 6 provides that any waiver is void and unenforceable (the Ohio statute also prohibits waiver).

Section 7 prohibits "exclusive first runs" or "exclusive multiple first runs" of motion pictures for more than 42 days "without provisions to expand the run to second run or subsequent run theatres within the geographical area...."[16] A distributor may not agree to show a motion picture on an exclusive basis for more than 42 days. An exhibitor with theatres in prime locations may show the picture for more than 42 days, but may not longer show it "exclusively" and the film must be "made available," or rebid.[17] The Ohio statute imposes no such limitation.

Section 8 establishes certain bidding procedures that closely resemble those required in Ohio. It does not make competitive bidding mandatory, but sets forth requirements that must be followed if bidding is initiated:[18]

---

rental basis and this means of obtaining rental is not affected by the Act. A certain figure is set aside for the exhibitor to cover "house expenses." The distributor receives a varying proportion of the net remainder, such as 90%, with the exhibitor retaining the remaining 10%. As the exhibition of a film continues, the exhibitor's percentage normally increases and the distributor's declines. Levy and Greenfield Affidavits, ¶ 14; Schlanger Affidavit, ¶ 17. A "guarantee" would often be coupled with a percentage rental. A guarantee established a minimum rental that the distributor would receive and the exhibitor would pay, whatever the receipts were at the box office. Levy and Greenfield Affidavits, ¶ 14; Fox Affidavit, ¶ 7.

**15.** Advance payments were partial rentals paid in advance before the initial exhibition of a motion picture. Levy and Greenfield Affidavits, ¶ 14; Schlanger Affidavit, ¶ 9(G); Fox Affidavit, ¶ 8.

**16.** Before the Pennsylvania Act was passed, the term or time period of the license would be stipulated in the license agreement and included in the negotiations between distributor and exhibitor. Levy and Greenfield Affidavits, ¶ 15; Fox Affidavit, ¶ 5.

**17.** Although the Schlanger Affidavit, ¶ 15, speaks of "unduly long guaranteed exhibition runs," and ¶ 5 of the Fox Affidavit asserts that exhibitors are forced to play motion pictures for "long periods of time," the Act does not bar long runs, only exclusivity.

**18.** Before the Act was passed, licensing of motion picture films for exhibition was carried out in Pennsylvania in several ways, including direct negotiation with individual exhibitors and the distributor's solicitation of bids from exhibitors in a particular market area. Levy and Greenfield Affidavits, ¶ 10; Exhibit "A" to Budco's Answer. On some occasions, the distributor would reject all bids and would then undertake to negotiate with one or more exhibitors who had bid or with entirely different exhibitors. Levy and Greenfield Affidavits, ¶ 10; Schlanger Affidavit, ¶¶ 9(D), 9(E). The information normally provided on a bid solicitation included the title of the film, identification of the talent involved (the actors, director, writer, producer, etc.), the type of film, and a general plot summary. Exhibit "A" to Budco's Answer; Schlanger Affidavit, ¶ 9(A). When the license agreement was negotiated or bid before the motion picture was completed or available for viewing (or, on occasion, even when the film was complete), the motion picture would be licensed without an advance screening; that is to say, it would be "blind bid." Exhibit "A" to Budco Answers; Levy and Greenfield Affidavits, ¶ 17; Schlanger Affidavit, ¶ 9(A). Fox Affidavit, ¶¶ 4, 5; Section 3 of the Act, 73 P.S. § 203–3. On other occasions, when a film was completed in advance of licensing, exhibitors

Section 8(a) requires that certain information be provided to bidding exhibitors, including the identity of all bidders.

Section 8(b) requires that if the motion picture has not been trade screened, the distributor shall establish a date, time, and location of a trade screening in the bid literature.

Section 8(c) requires that all bids are to be submitted in writing and opened at the same time, in the presence of those exhibitors or their agents who submitted bids and who are present. Unlike Ohio's § 1333.-07(D), it does not require any exhibitor to be present.

Section 8(d) requires that a distributor make available to an exhibitor within 60 days after bids are opened any bid made for the same run by any other exhibitor—even if all bids submitted were rejected. The distributor is also required to notify in writing each exhibitor who submitted a bid for that run of the terms accepted and the identity of the successful bidder.

Section 8(e) provides that, if all bids are rejected, a distributor, once having issued invitations to bid, may not enter into a license agreement except by means of the bidding process specified in Section 8. In other words, he may not reject all bids and then enter into negotiations, nor may he withdraw the film from the market, but instead, he must continue the bidding process.

Section 10 of the Act provides to exhibitors (but not to distributors), a private right of action. No such right is provided in Ohio. Any exhibitor may sue a distributor, or an exhibitor, or both, for violations of the Act in a Court of Common Pleas for damages or injunctive relief and is entitled to recover costs, including reasonable attorney's fees. A distributor has no comparable right of action.

Because of the similarities and because of the many significant differences between the Act and the Ohio statute, this Court will examine afresh the issues presented by plaintiff's constitutional challenge, in light of Judge Duncan's thorough and thoughtful opinion upholding the constitutionality of that statute.

## II.

### THE STANDARDS FOR SUMMARY JUDGMENT.

The principle that summary judgment may be entered when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" is well-established. Rule 56(c), Federal Rules of Civil Procedure. This Court recently analyzed the principles that govern under Rule 56 in *Hollinger v. Wagner Mining Equipment Corp.*, 505 F.Supp. 894, 896–898 (E.D.Pa.1981):

"Characterized as both a 'drastic' and 'extreme' remedy, summary judgment should be used 'sparingly,' for it is a 'lethal weapon,' eliminating the opportunities to assess the demeanor and credibility of witnesses as well as to examine and cross-examine them in front of a jury. However, where no genuine issues of material fact exist and as a matter of law the moving party deserves entry of judgment, the Court should render it in order to eliminate sham issues of fact, to allow the Court to pierce the pleadings and assess the proof to determine whether a genuine need for trial exists, and to avoid waste of time and resources of both the litigants and the Court where trial would be a useless formality."

\* \* \* \* \* \*

"Courts exercise discretion only in denying summary judgment in a particular situation and use fastidious caution in granting it. The responsibility belongs to the Court to review all facts to determine whether a genuine issue exists as to any material fact, *which may be defined as one which affects the outcome of the*

---

might be invited to attend a "trade screening," or a screening in advance of licensing. Levy and Greenfield Affidavits, ¶¶ 17, 20; Fox Affidavit, ¶¶ 10, 20.

litigation." [Emphasis added: citations and footnotes omitted].

■ This Court is required to make the following three-step analysis. *First,* in examining the record, it must resolve all doubts against the moving party, upon whom the initial burden of justifying the motion falls, and construe the motion in the light most favorable to its opponents, *see Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

*Second,* it must ascertain whether disputes exist with regard to any material fact, defined as a fact that "affects the outcome of the litigation." *See Mutual Fund Investors, Inc. v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977), *cert. denied* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748; *Goodman v. Mead, Johnson & Co.,* 534 F.2d 566 (3d Cir. 1978). While summary judgment may not be granted if there exist issues of material fact relevant to the Court's decision of the issues presented, the Court must not search for the existence of such issues. *Lockhart v. Hoenstine,* 411 F.2d 455 (3d Cir. 1969), *cert. denied,* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969).

■ *Third,* the Court must determine whether "a genuine need for trial" exists with regard to the decision of the legal issues presented or whether any purported factual questions are "largely illusory and a trial would be a 'useless formality.'" *See Cousins v. Yaeger,* 394 F.Supp. 595 (E.D.Pa. 1975). It may not refuse to grant summary judgment if the purported factual disputes alleged by a party are not material to decision of the legal issues in the case. *See British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241

(1979), *reh. denied* 441 U.S. 968, 99 S.Ct. 2420, 60 L.Ed.2d 1074 (1979) (deposition evidence that plaintiff tried to introduce was not probative with regard to the ultimate issue, the cause of an airplane accident, and did not create any conflict concerning a material fact despite the obvious presence of a factual dispute). That an action involves constitutional questions does not change the standard to be applied. *See Village of Schaumburg v. Citizens For A Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), *reh. denied* 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 250 (1980) (Supreme Court affirmed the propriety of granting summary judgment for plaintiffs in a case involving interference with rights protected by the First Amendment).

■ Applying those standards to this case, I conclude that, with regard to plaintiffs' First Amendment and Supremacy Clause claims, there are no *material* facts in dispute and there exists no "genuine need for trial."

Defendants urge this Court to deny plaintiffs' motion because of the existence of two categories of facts which, they argue, are both disputed and material, namely (1) the alleged relative disparity in economic power, size, and concentration between distributors and exhibitors, and the distributors' purported abuse of that disparity, which, defendants claim, provide justification for the Act; and, (2) the need factually to ascertain the extent and nature of the burdens that the Act may impose on constitutionally protected activities. It is true that these "facts," particularly the economic "facts," are vigorously disputed by the parties.[19] However, questions that pertain

19. The Schlanger and Fox affidavits purport to describe plaintiffs' "economic concentration" and control of the distribution of motion pictures and characterize plaintiffs' practices before the Act was passed as abuses of that superior bargaining power. Schlanger Affidavit, ¶¶ 5, 6; Fox Affidavit, ¶ 3. Plaintiffs, in their reply memorandum, vigorously contest these assertions. Thus, the "fact" of relative economic power and its implications is very much at issue. However, it is not material to

the issue of the facial unconstitutionality of the Act under the First Amendment and the Supremacy Clause.

By contrast, although defendants have questioned the relevance of many of plaintiffs' factual assertions, they have not denied them in their affidavits. Rule 56(e) of the Federal Rules of Civil Procedure provides in pertinent part that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere

to them do not require resolution in order to decide the legal issues presented in this motion. The real disputes between the parties in this case are not factual but legal and concern the standards of analysis to be applied to the Act and to plaintiffs' constitutional claims.

With regard to disparity in bargaining power and size between distributors and exhibitors, concentration in motion picture distribution and abuse of superior bargaining power by distributors, even if each and every fact put forward by defendants were assumed to be accurate for purposes of the instant motion for summary judgment, *see Adickes v. Kress, supra,* a contrary decision concerning the constitutionality of this Act on First Amendment and Supremacy Clause grounds would not be compelled. The factual issues that defendants contend exist might be material with regard to a more narrowly drawn statute, like Ohio's, whose purpose was found by Judge Duncan to be to "effect a better balance of bargaining power between exhibitors and producer-distributors...." by correcting purported abuses of that bargaining power, *Allied Artists Pictures Corp. v. Rhodes, supra,* 496 F.Supp. at 429.[20] However, Pennsylvania's more comprehensive Act must be judged by more rigorous standards than Ohio's comparatively limited regulation and the economic facts at issue are not material to the "compelling" or "significant" public purposes required to justify it.

In its broad regulation of the copyright licensing process under which motion pictures, which contain expression protected by the First Amendment, are made available to theatre audiences, the Pennsylvania Act indisputably affects rights protected by the First Amendment and granted under the federal Copyright Act, 17 U.S.C. § 101 *et seq.* See Sections III and IV, *infra.* Therefore, it must serve "compelling" or "significant" public purposes. *See, e. g., First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978) *reh. denied* 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 150 (1978). The facts that defendants assert are "material" are relevant to the purpose of "weighting a balance....," 496 F.Supp. at 431, between private economic entities, but such equalizing of bargaining relationships between business enterprises has never been the kind of "compelling" purpose required to justify limitations upon rights protected by the First Amendment or granted by federal legislation and protected by the Supremacy Clause. Economic "facts" that might be relevant to that legitimate regulatory purpose are not material to the more compelling purposes required to sustain the constitutionality of the Pennsylvania Act.

Furthermore, assuming *arguendo* that the purpose of correcting abuses due to "economic disparity" were sufficiently compelling to justify some regulatory intrusion into rights protected by the First Amendment or some limitation on a right granted by Federal copyright legislation, the Pennsylvania Act's comprehensive combination of regulations is overbroad in its scope and goes beyond serving any such assumed legitimate purpose. The Act entirely and absolutely eliminates certain provisions from license agreements—regardless of the existence of any abuses or the existence of economic disparity between the parties or whether the practices were coerced or mutually sought. It does so by prohibiting a broad spectrum of prior practices in combination, although defendants themselves as-

allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial." Defendants' efforts to create the appearance of an issue of fact do not meet the criteria of Rule 56(e).

**20.** In *Allied Artists Pictures Corp. v. Rhodes, supra,* 496 F.Supp. at 429, Judge Duncan applied the liberal "due process" tests of such cases as *United States v. Carolene Products Co.,* 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938) and *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) to the more limited Ohio statute, asking only if there existed "a rational nexus between the legitimate object and the means chosen to achieve it ...," 496 F.Supp. at 431. More stringent examination of Pennsylvania's comprehensive enactment is required.

sert that practices such as guarantees were injurious primarily because combined with "blind bidding." [21] The Act does not narrowly address itself to specific abuses, as is required when expression is affected even indirectly, see Section III, *infra*, but simply prohibits a number of licensing terms outright, in combination. For this reason, as well, although the economic facts defendants have set forth might be relevant to a more limited statute like Ohio's that purports to correct specific abuses more precisely, they are not material to the constitutional issues presented by the Pennsylvania Act, which imposes blanket prohibitions.

*Citizens For A Better Environment v. Village of Schaumburg*, 590 F.2d 220 (7th Cir. 1978), *aff'd sub nom. Village of Schaumburg v. Citizens For A Better Environment, supra*, is directly applicable to and disposes of defendants' argument that facts concerning plaintiffs' practices before the Act was passed (about which there is dispute) are material and must be developed through discovery and a trial. In that case, plaintiff brought a declaratory attack under the First Amendment on a village ordinance that imposed a blanket requirement that 75% of the proceeds of charitable solicitation be used directly for the charitable purposes of the soliciting organization—regardless of the nature of the organization or plaintiff's activities or the existence of any abusive practices by plaintiff. The District Court held that the "75% requirement" was an impermissible, although indirect, restraint upon plaintiff's exercise of its First Amendment freedoms. On appeal, the village asserted that the entry of summary judgment was improper because there existed issues of material fact concerning plaintiff's actual practices. The Court of Appeals (and subsequently, the Supreme Court) agreed with plaintiff that those fact issues, including characterizations of plaintiff's activities, were irrelevant to the question of the overbroad ordinance's constitutionality on First Amendment grounds.

As was true in *Schaumburg*, factual questions concerning plaintiffs' practices or the alleged economic disparity between the parties are not material to decision of the Act's constitutionality. The Feature Motion Picture Fair Business Practices Law, like the ordinance in *Schaumburg*, imposes blanket (and nonwaivable) prohibitions on certain business practices in combination—all guarantees, all payment in advance of exhibition, all advance negotiation prior to a trade screening, and various other practices are simply forbidden, even if such practices have not been coerced, and regardless of any abuse of any sort by a distributor, or of whether more narrowly drawn or fewer prohibitions might correct the abuse.

As to facts concerning the Act's burdens on constitutional rights (see Section III(B), *infra*), the relevant cases in the First Amendment and the Supremacy Clause areas demonstrate that the question of the Act's constitutionality may be determined from the face of the legislation without development of additional facts. The legal standard in those contexts is whether a statute presents the risk of infringing upon protected rights. Proven interference with activities protected by the First Amendment or that are the subject of comprehensive federal regulation is not a necessary prerequisite to a determination of facial unconstitutionality; the statute's potential for harm on its face is determinative. See *Village of Schaumburg v. Citizens For A Better Environment, supra*, 444 U.S. at 632, 100 S.Ct. at 833 ("75% requirement" created the risk of limiting advocacy of particular views); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 257, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (risk that requirement that newspapers provide access for views opposing editorials might cause newspapers to limit their editorials to less controversial matters); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (striking a state censorship statute that created the risk of delay in exhibiting motion pictures and thus, of suppressing protected expression); *Grosjean v. American Press Co.*, 297 U.S. 233, 250–51, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936) (state license

21. *See* Fox Affidavit, ¶¶ 4, 5, 7.

tax on advertising stricken because of the risk that it would inhibit publication); *Crane Co. v. Lam*, 509 F.Supp. 782, CCH Fed.Sec.L.Rep. ¶ 97,896 (E.D.Pa.1981) (preliminary injunction granted against Pennsylvania Takeover Disclosure Act because of its potential for substantial interference with a federal statute).

Many facts concerning the relative economic status of the parties, plaintiffs' practices, or the effects of the Act might be ascertained in discovery or through a lengthy trial. However, further discovery and factual development of these myriad (but non-material) facts would not affect decision of the First Amendment and Supremacy Clause issues.

### III.

### THE ACT'S INTERFERENCE WITH RIGHTS PROTECTED BY THE FIRST AMENDMENT.

■ Decision of plaintiffs' First Amendment claims disposes of this motion. Although the Act does not directly command or prohibit any type of content, it comes within the scope of the cases that have stricken indirect restraints upon content. It creates risks of restricting protected expression; its purposes do not meet the standard that the cases require, namely, that they be "substantial" or "compelling;" and its prohibitions are not drawn with the precision that is required of a state legislative regulation that affects dissemination of protected expression even indirectly.

A. *The Act imposes indirect restraints upon a protected activity*

■ It is well-established that motion pictures are a form of creative expression protected by the First Amendment, although they are not "necessarily subject to the precise rules governing any other particular method of expression...." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952), and although this protection is not absolute. *Times Film Corp. v. Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), *reh. denied*

365 U.S. 856, 81 S.Ct. 798, 5 L.Ed.2d 820. With the exception of obscenity, which is not involved in this case, this protection applies regardless of the film's content. *See e. g., Erzoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Interstate Circuit v. Dallas*, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968).

The fact that motion pictures are commercial endeavors does not alter their protected status. *See Joseph Burstyn, Inc. v. Wilson, supra*, 343 U.S. at 501–502, 72 S.Ct. at 780. In fact, recent cases have made it quite clear that so-called "commercial" speech engaged in by corporate entities is entitled to First Amendment safeguards. *See Metromedia Inc. v. City of San Diego*, —— U.S. ——, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Consolidated Edison Co. of New York v. Public Service Comm'n.*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978). *See also Buckley v. Valeo*, 424 U.S. 1, 16, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976) ("this Court has never suggested that the dependence of a communication on the expenditure of money operates itself ... to reduce the exacting scrutiny required by the First Amendment."). Motion pictures, of course, cannot be equated with mere "commercial speech" such as advertisements, commercial billboards, billing inserts, or the like, *See Central Hudson Gas & Electric Corp. v. Public Service Comm'n.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), *on remand* 51 N.Y.2d 817, 433 N.Y.S.2d 426, 413 N.E.2d 365, because, as creative expressions of ideas, they come directly within the ambit of the First Amendment. *Erzoznik v. City of Jacksonville, supra; Joseph Burstyn, Inc. v. Wilson, supra*.

The Act whose constitutionality is at issue in the present case obviously does not censor the content of motion pictures or require producers or distributors to adhere to one idea at the expense of others, or forbid them to make or to distribute any particular type of motion picture. In that sense, defendants are correct when they

describe the Act as "content-neutral" and distinguish it from censorship regulations designed to suppress speech because of its content. *See Allied Artists Pictures Corp. v. Rhodes, supra,* 496 F.Supp. at 432. Obviously, the Act is not identical to an ordinance prohibiting live entertainment (*see Schad v. Borough of Mt. Ephraim,* —— U.S. ——, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)), or to a regulation forbidding the sale of a particular type of book to young people (*see Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)), or to a content-based restriction on what may be shown in a particular forum. *See, e. g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (striking down prohibition against use of municipal theatre for a performance of the musical "Hair").

However, the conclusion that the Act does not regulate content, but, instead, affects the distribution and exhibition of all motion pictures in Pennsylvania, regardless of content, does not dispose of plaintiffs' claims. The Act comprehensively and directly regulates the licensing process—the means by which all motion pictures, and the ideas they contain, are made available to the theatre-going public in the Commonwealth—and, on its face, creates risks of limiting expression. The cases hold with unanimity that, even if a statute or ordinance indirectly restrains speech, it is unconstitutional if it has that effect and does not further "an important or substantial governmental interest ... unrelated to the suppression of free expression ..." and "the incidental restriction on alleged First Amendment freedoms is 'no greater than is essential to the furtherance of that interest.'" *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), *reh. denied sub nom. O'Brien v. United States,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188. The "exacting scrutiny" required by the First Amendment cases "is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct governmental action, but indirectly as an unintended but inevitable result of the government's con-

duct...." *Buckley v. Valeo, supra,* 424 U.S. at 64–65, 96 S.Ct. at 656 (holding unconstitutional a "content-neutral" statute that impinged upon freedom of speech by imposing expenditure limitations upon candidates for public office).

Quite recently, the Supreme Court demonstrated the continuing validity of this principle in *Village of Schaumburg v. Citizens For A Better Environment, supra,* 444 U.S. at 632, 100 S.Ct. at 833. It held there that an ordinance's imposition of a flat percentage requirement on the use of proceeds from door-to-door solicitation, although it was not enacted to limit the protected solicitation and was therefore "content-neutral", was unconstitutional because it might limit "informative and perhaps persuasive speech seeking support for particular causes or for particular views...." and presented the risk that "without solicitation the flow of such information and advocacy would likely cease." *Ibid.*

■ The courts have made it clear that the First Amendment's protection extends to the means of distribution of protected expression as well as to protection of content itself. *See, e. g., Philadelphia Newspapers, Inc. v. Borough Council of Swarthmore,* 381 F.Supp. 228, 240 (E.D.Pa.1974) (holding that newspaper boxes along public streets are constitutionally protected); *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); *Grosjean v. American Press Co., supra,* 297 U.S. at 251, 56 S.Ct. at 449. The Pennsylvania Act regulates the licensing process by which protected expression is made available to the public, just as the ordinance at issue in *Philadelphia Newspapers, Inc. v. Borough Council of Swarthmore, supra,* regulated the means of distribution of newspapers.

Defendants' argument that, because the Act only regulates the licensing process, not the content of films themselves, it does not violate the First Amendment, must therefore be rejected. Their formulation ignores the meaning of the cases discussed above—namely, that non-traditional or indirect regulation of the means of communicating pro-

tected speech may affect the ability to communicate those ideas. *See, e. g., Grosjean v. American Press Co.*, 297 U.S. at 244–45, 56 S.Ct. at 446–47 (state license tax directed at newspapers violated the First Amendment because it might have limited circulation). Recognizing that courts must be alert to unusual restrictions upon First Amendment rights that appear innocently clothed as "indirect" restraints, the Supreme Court, in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256, 94 S.Ct. 2831, 2838, 41 L.Ed.2d 730 (1974), rejected a statutory requirement that newspapers make available space for reply to controversial editorials and wrote:

> "The Florida statute operates as a command in the same sense as a statute or regulation forbidding appellant to publish specified matter. Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." [Footnotes and citations omitted].

■ Even if defendants' characterization of the Act's effects on protected speech as not only "indirect" but merely "peripheral" and "incidental" were correct, that would not end the inquiry, for "[e]ven where a challenged regulation restricts freedom of expression only incidentally or only in a small number of cases, we have scrutinized the governmental interest furthered by the regulation and have stated that the regulation must be narrowly drawn to avoid unnecessary intrusion on freedom of expression." *Schad v. Borough of Mt. Ephraim, supra,* —— U.S. at —— n.7, 101 S.Ct. at 2183 n.7 (1981) [*citing United States v. O'Brien, supra,* 391 U.S. at 376–377, 88 S.Ct. at 1678–1679.]. When the standards for analyzing indirect restraints upon communication are applied to the risks that the Act's provisions create on their face—risks of delays in licensing and of financial uncertainty as well as other burdens—it must be concluded that its restraints, although indirect, affect the dissemination of protected expression in motion pictures in a manner that violates the First Amendment.

**B.** *The Act creates the risk of inhibiting protected expression*

On its face, the Act creates the risk of delay in licensing and of shifting financial burdens and uncertainties—indeed, defendants argue in their affidavits that the latter is one of the Act's purposes.[22] These risks, which threaten expression itself and its dissemination in motion pictures, are inherent and unavoidable in the statutory scheme and are clear on the face of the Act.

■ Defendants correctly assert that actual proof of the Act's impact upon the financing, booking, or release of motion pictures can only be ascertained after discovery and possibly, after a trial. However, in making this assertion, they ignore the well-established principle that the risk of infringement of First Amendment rights is sufficient to establish a statute's burdens, whether the regulation in question affects expression directly or indirectly. Proof of impact is not essential to decision of this motion on First Amendment grounds. *See, e. g., Village of Schaumburg v. Citizens For A Better Environment, supra,* 444 U.S. at 632, 100 S.Ct. at 833 ("75% requirement" created the risk of limiting the seeking of support for particular causes). To declare a statute or ordinance unconstitutional on First Amendment grounds, actual proof of infringement of expression is not necessary. For example, in *Murdock v. Pennsylvania,* 319 U.S. 105, 114, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943), the Supreme Court observed that a license tax on distribution of religious literature was "likely to restrict petitioners' religious activities. On their face, they are a restriction of the free exercise of those freedoms which are protected by the First Amendment." *See also Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) (involving "indirect" time and place restrictions on leafletting which did not impose a total ban on the protected activity).

Some examples will illustrate the way these considerations apply to the risks cre-

---

**22.** *See, e. g.,* Schlanger Affidavit ¶ 10.

ated by the instant Act. As to delay, Sections 4, 7, and 8, as well as others, create on their face the risk of delay in licensing. Under Section 4, there may be absolutely no negotiation or solicitation of bids in Pennsylvania before a picture has been trade-screened—and, obviously, the film cannot be trade-screened before it is completed. The effect of Section 4 inevitably must be to delay licensing until after completion of the film—no matter how much information is available to an exhibitor, or regardless of the exhibitor's size, or how intensely it wants to exhibit a given picture based on its knowledge of the talent or subject matter.[23] These requirements, on their face, create the risk of delay in licensing and potentially affect expression and its dissemination in copyrighted motion pictures.[24]

Section 8 compounds that risk. Requirements such as that a trade screening be held before bids are invited or negotiations take place, or that, in the event that all bids are rejected, there may be no private post-bidding negotiation, but instead, the picture must be re-bid, create an additional (and undesirable) risk of delay in the licensing of motion pictures that is substantial and not merely "theoretical." *Buckley v. Valeo, supra*, 424 U.S. at 19, 96 S.Ct. at 634. Before the Act was passed, if the bidding process failed to produce a satisfactory result, negotiations between a distributor and an exhibitor were permitted. The Act prohibits this.

Furthermore, the requirement of Section 7, that a motion picture be "made available" after 42 days to subsequent run theatres, opens the door to additional delays if the film is to be "made available" by bidding. The risks of delays in licensing which potentially affect expression that are created by Sections 7 and 8 are obvious from the face of the Act.

*Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), is perhaps the Court's definitive statement of the unconstitutionality of the risk of delay in the licensing of motion pictures for exhibition in theatres. There, a statute requiring motion pictures to be submitted to a State Board of Censors for the purpose of sorting out obscene from constitutionally protected films was held unconstitutional. The Court struck down the statute because its burdensome and time-consuming procedures created both the "risk of delay" and the "danger of unduly suppressing protected expression. . . .", 380 U.S. at 54, 85 S.Ct. at 736 [emphasis added]. The Court (Justice Brennan) observed that "in the case of motion pictures, it may take very little to deter exhibition in a given locality." *Ibid.*[25] Whether factual bases existed for the expectation of delay or suppression was not at issue; the standard of constitutionality was the presence of the risk.[26] *See also Southeastern Promotions Ltd. v. Conrad, supra*, 420 U.S. at 560–62, 95 S.Ct. 1239, 1247–48, 43 L.Ed.2d 448 (risk of discouraging use of a public forum and of delaying unconstitutionally affected First Amendment liber-

---

**23.** Despite its prohibitions, the Act does not require an exhibitor actually to attend a trade screening and see the motion picture in advance. It merely requires that all motion pictures offered for licensing in Pennsylvania be trade screened. *See* Section C, *infra*, for discussion of the way the Act goes beyond prohibiting any abuses such as coercion of an exhibitor to accept an unknown product, or deceptive practices or fraud.

**24.** *See Allied Artists Pictures Corp. v. Rhodes*, 496 F.Supp. at 423, 435. where Judge Duncan found as a fact that the Ohio statute posed a risk of some delay in the release of films. He also recognized that because the Ohio statute "prohibits bidding until after trade screening, it necessarily entails that release of a completed motion picture is suspended during the time it

takes to complete the bidding procedure." *Id.* at 421.

**25.** Justice Brennan, in discussing the risk of delay created by the statute, also noted that "[i]t is common knowledge that films are scheduled well before actual exhibition . . . .," a point made as well by Judge Duncan in Ohio. *See Allied Artists Pictures Corp. v. Rhodes, supra*, 496 F.Supp. at 422.

**26.** Maryland subsequently enacted a more limited statute that met *Freedman's* requirements and that was upheld by the Supreme Court. *See Star v. Preller*, 375 F.Supp. 1093 (D.Md. 1974), *aff'd without opinion* 419 U.S. 956, 93 S.Ct. 3054, 37 L.Ed.2d 1016 (1974).

ties); *Allied Artists Pictures Corporation v. Rhodes, supra*, 496 F.Supp. at 433 ("a delay of expression is an abridgement of it; where the delay is not justified by a substantial governmental interest it cannot be condoned."); *Goldman Theatres, Inc. v. Dana*, 405 Pa. 83, 173 A.2d 59 (1960), *cert. denied* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).[27]

As to financial uncertainties which might affect expression, defendants themselves assert that the licensing and exhibition of motion pictures involve "significant economic risks" (Fox Affidavit, ¶ 4), and that there exist certain "risks as to the economic viability of the pictures" (Schlanger Affidavit, ¶ 10). *See also Allied Artists Pictures Corp. v. Rhodes, supra*, 496 F.Supp. at 415, observing that the motion picture industry is a "high risk, high profit business." It is clear that the Act, on its face, by prohibiting guarantees, advances, and exclusive first runs limited only by market demand, enhances the financial risks that the distributor of motion pictures must bear. This was recognized in *Allied Artists*, where Judge Duncan observed that even the less stringent Ohio statute "has a potential for increasing the plaintiffs' production and marketing costs . . . ," 496 F.Supp. at 423, that "[a]bolition of guarantees means the production occurs without prompt reimbursement; costs are not recovered, if at all, until after the film is completed . . . ." 496 F.Supp. at 434, and that the Ohio statute prohibited "risk-shifting devices." *Id.* at 423. Furthermore, defendants here have complained that before the Act was passed, exhibitors were forced to bear some risks of lack of commercial success. Schlanger Affidavit, ¶ 11. The implication is that the Act has increased the risk to the producer/distributor.

In Pennsylvania, if a percentage of gross receipts license term is utilized, any guarantee of return is forbidden. This prohibition,

on its face, increases the acknowledged risk of the enterprise that must be borne by the makers and distributors of motion pictures. The 42-day provision (Section 7) creates the risk that exhibition of a given motion picture might not take place for a period of time sufficient to make it economically worthwhile. The prohibition against advances prevents a distributor from obtaining security from exhibitors for any reason whatsoever. These limitations on prior practices plainly have a potential impact, even though indirect, upon the production, distribution and exhibition of motion pictures, recognized as a risky undertaking.

Statutes that create the presence of financial or other risks that might inhibit expression have been held to be unconstitutional as a matter of law. Thus, in *Miami Herald Publishing Co. v. Tornillo, supra*, 418 U.S. 241, 257, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974), the Court found impermissible under the First Amendment the risk that newspaper editors, required to provide free space for response to controversial editorials, might feel compelled by the economics of this government-imposed access requirement to stop printing the controversial editorials. In *Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976) the Court observed that financial limitation "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." Most recently, in *Village of Schaumburg, supra*, 444 U.S. at 632, 100 S.Ct. at 833, the Court recognized that "without solicitation [for funds] the flow of such information and advocacy would likely cease." Many years earlier, in *Grosjean v. American Press Co., supra*, 297 U.S. at 245, 56 S.Ct. at 447, the Court held that a state license tax, directed at newspapers and magazines, and imposed on gross receipts upon advertising in well-circulated newspapers, violated the

27. *See Nebraska Press Association v. Stuart*, 423 U.S. 1327, 1329, 96 S.Ct. 251, 253, 46 L.Ed.2d 237 (1975), in which Justice Blackmun wrote in another context:

"Each passing day may constitute a separate and cognizable infringement of the First

Amendment. The suppressed information grows older. Other events crowd upon it. To this extent, any First Amendment infringement that occurs with each passing day is irreparable."

First Amendment because its "tendency is to restrict circulation ... destroying both advertising and circulation ...." And in *Murdock v. Pennsylvania*, 319 U.S. 105, 114, 63 S.Ct. 870, 875, 87 L.Ed.2d 1292 (1943), it held that the costs of a commercial solicitation tax, applied to religious groups, "restrains in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise."

Significantly, most of the above restraints were not directly or explicitly content-related. In all of the cases in which they were involved, the Court recognized the dangers of such indirect restraints to the ability to express ideas and to their free dissemination—the very risks that the Act's restrictions pose.

On their face, the Act's prohibitions against guarantees, long exclusive first runs, and advances throw the undisputed financial risks of motion picture production, distribution, and exhibition more heavily on the producer/distributor and create the danger of affecting the financial investment processes through which motion pictures and the ideas they express, are created and communicated.[28] The cases demonstrate that extensive factual analysis of the actual burdens that might be imposed by the Act is not necessary; a genuine risk of affecting activities protected by the First Amendment, if not counterbalanced by significant public governmental purposes, served by a precisely tailored enactment, is itself unconstitutional.

**28.** *Allied Artists Pictures Corp. v. Rhodes, supra*, 496 F.Supp. at 415.

**29.** *See also First National Bank of Boston v. Bellotti, supra*, 435 U.S. at 786, 98 S.Ct. at 1421. There, a state law prohibited certain businesses, such as banks, from making contributions to publicize their views on political issues, other than on questions that materially affected their property. The Supreme Court viewed this "indirect" restriction as directly limiting the subjects of corporate speech. In striking down the restraint, it forcefully stated the governing requirements:

" '[T]he State may prevail only upon showing a subordinating interest which is compelling' ... 'and the burden is on the government to show the existence of such an interest....' "

C. *When standards for evaluating indirect restraints upon expression are applied to the Act, it is clear that its purposes are not compelling and that its restraints are overbroad.*

In *United States v. O'Brien, supra*, 391 U.S. at 376–77, 88 S.Ct. at 1678–79, the Supreme Court set forth the still-accepted four-pronged test for evaluating the impacting of indirect statutory regulation of expression.

"To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." [29]

When the standards of analysis that are set forth in *O'Brien* and the subsequent cases that have followed its principles are applied to the Act, it is clear that the Pennsylvania Act's explicit and implicit purposes do not meet its criteria and that the Act's non-waivable and comprehensive prohibitions are not drawn with the narrow precision that the cases require.[30]

Even then, the state must employ means 'closely drawn to avoid unnecessary abridgement....' " [citations omitted].

Under *Bellotti*, the state, as the proponent of legislation must meet the burden of demonstrating the existence of a compelling interest, and must "closely draw" the legislative means to achieve that purpose while avoiding unnecessary abridgement of free expression.

**30.** When First Amendment interests are involved, a court may not apply the liberal "rational basis" due process test of *United States v. Carolene Products Co., supra*, 304 U.S. 144, 152, 58 S.Ct. 778, 782, 82 L.Ed. 1234 (1939), and *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934), in which the "laws passed" must only have a "reasonable

With regard to purposes, the legislature's list in Section 2 of the Act (*see* note 12, *supra*) cannot be deemed to contain purposes that are sufficiently "substantial," "significant," or "compelling" public or governmental interests to justify the Act.[31] Asserted purposes 1, 4, 5, and 9 (*see* note 12, *supra*), speak generally of broadening public access to motion pictures, particularly with regard to subsequent "runs," but, like the governmentally-coerced access found constitutionally unacceptable in *Miami Herald Publishing Co. v. Tornillo, supra,* 418 U.S. at 255, 94 S.Ct. at 2838, such objectives create the risk of indirect burdens that inhibit expression, and under the cases, are insufficiently compelling to justify the Act's potential restraints upon expression. Section 2, which speaks of the "access of the public" and "insuring unabridged access" to motion pictures, when read together with the requirement of Section 7, that a film be reoffered after 42 days for exhibition at subsequent run theatres, or of Section 8(e) that, once invitations for bids are issued, a motion picture may not be withdrawn, appears to run afoul of the Supreme Court's opinion in *Miami Herald, supra,* which rejected such requirements.

Asserted purposes 2, 3, 6 and 8 (*see* note 12, *supra*), refer generally to protection of the private business interests of the exhibitors in relation to distributors or to enhanc-ing competition.[32] However, the cases demonstrate that protection of the commercial interests of a private group, here, motion picture exhibitors, is not sufficiently "compelling" to justify intrusion into areas protected by the First Amendment.

Asserted purpose 10 simply speaks of the need to prohibit "blind bidding."

When these purposes are examined in the light of the purposes found insufficient to support regulation in such cases as *Buckley v. Valeo, supra,* invalidating a limitation on campaign expenditures as an indirect restraint on speech, or *Village of Schaumburg, supra,* invalidating the "75% requirement," or the many other cases that could be cited, it is clear that they cannot sustain this Act's restraints. An illustrative case is *Home Box Office v. Federal Communications Comm'n.,* 567 F.2d 9, 49–50 (D.C.Cir. 1977), *cert. denied sub nom. Federal Communications Comm'n. v. Home Box Office,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), *reh. denied* 434 U.S. 988, 98 S.Ct. 621, 54 L.Ed.2d 484 (1977), *later app.* 587 F.2d 1248 (1978). There the Court applied the *O'Brien* criteria and struck down administrative regulations with a strong presumption of validity promulgated by the FCC and with the ostensible valid purpose of avoiding "siphoning." The Court found that, while those regulations, prohibiting all

relation to a proper legislative purpose and [be] neither arbitrary nor discriminatory. . . ." *Id.* at 537, 54 S.Ct. at 516. *Compare Allied Artists Pictures Corp. v. Rhodes, supra,* applying that "rational basis" test to the more limited Ohio enactment and finding that "the Act rationally relates to a number legitimate and important state interests." 496 F.Supp. at 432. A more demanding standard is required when a state's laws "run afoul of some specific constitutional provision or other federal law." *City of New Orleans v. Dukes,* 427 U.S. 297, 304, n.5, 96 S.Ct. 2513, 2517, n.5, 49 L.Ed.2d 511 (1976), on remand 537 F.2d 856 (5th Cir.).

**31.** Furthermore, a Court must look behind a recitation of purpose, for ". . . the mere recitation of purpose, for ". . . the mere recitation of purpose, for, but a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975). *See also Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1279

(5th Cir. 1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (rejecting stated state legislative purposes in a takeover statute as irrelevant); *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981), holding (in the context of a Commerce Clause challenge to a state statute) that:

"[T]he incantation of a purpose to promote the public health or safety does not insulate a state law from . . . attack."

**32.** As to enhancing competition, or asserted purpose 7, prevention of deception, even if these purposes were legitimate and/or substantial, and not mere "incantations," *see Kassel, supra,* 450 U.S. at 670, 101 S.Ct. at 1316, *Village of Schaumburg, supra,* 444 U.S. at 636, 637, 100 S.Ct. at 836, the cases demonstrate that they must be served by more narrowly drawn means.

advertising during programs and limiting the number of feature films and sportcasts combined, did not regulate content directly, they violated the First Amendment as indirect restraints. Applying the *O'Brien* standard, it held (*id.* at 49–50):

"The no-advertising and 90-percent rules clearly violate *O'Brien's* first criterion. Not only do they serve no 'important or substantial . . . interest,' 391 U.S. at 377 . . . they serve no purpose which will withstand scrutiny on this record. . . . Instead, the Commission has indulged in speculation and innuendo. *O'Brien* requires that 'an important or substantial government interest' be demonstrated. . . ." (Footnotes omitted).

The purposes cited by defendants in their briefs (such as correcting the effects of economic disparity) do not advance their argument. Indeed, they weaken defendants' argument by emphasizing the absence of any compelling *public* purposes that serve as a foundation for the Act's broadly conceived restraints.

Defendants have argued that the Act is no different from the laws of general application designed to implement policies such as equal employment, antitrust, zoning, product safety, fraud prevention, or consumer protection and the like, and that its effects are "peripheral" restrictions on expression with which the First Amendment, whose purpose is to protect fundamental freedoms, is not concerned. It is true that cases like *Pittsburgh Press Co. v. Pittsburgh Comm'n. on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), *reh. denied* 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128, where the Court held that

the newspaper industry whose "product" is protected speech must follow the laws governing equal employment, and others cited by defendants that uphold statutes of general application regulating antitrust violations or labor relations, demonstrate that businesses whose product is expression are as subject as are any other enterprises to laws of general application carrying out valid public policies. However, the Pennsylvania Act is not a statute of general application but a comprehensive regulatory enactment directly regulating motion picture licensing and its purposes are not comparable to those in the regulation upheld in *Pittsburgh Press* ; nor are the Act's effects "peripheral." [33] The cases on which defendants rely do not support this Act's comprehensive regulation of the means of distribution and exhibition of motion pictures in Pennsylvania—regulation that is addressed solely to one aspect of one business. *See, e. g., Metromedia, Inc. v. City of San Diego, supra,* —— U.S. at ——, 101 S.Ct. at 2896.

Nor is the Act like a consumer protection statute. Despite the general language in Section 2, the Act limits transactions between business entities, not between the ultimate consumer and an entity engaged in deceptive practices. *Compare Donaldson v. Reed Magazine, Inc.*, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948) (postmaster-general determined that a contest was fraudulent and refused to allow use of the mails for circulation of books and magazines offering prizes); *Savage v. Commodity Futures Trading Comm'n.* 548 F.2d 192 (7th Cir. 1977) (regulation of fraud in commodity trading).

The purposes of Section 2, and those which defendants propose, might well be

---

**33.** Thus, this case is very different from those cited by defendants. *Compare Lorain Journal Company v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) (newspapers are subject to the antitrust laws); *Oklahoma Press Publishing v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (the Fair Labor Standards Act applies to newspapers); *United States v. Hunter*, 459 F.2d 205 (4th Cir.), *cert. denied sub nom. Hunter v. United States*, 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), *reh. denied* 413 U.S. 923, 93 S.Ct. 3046, 37 L.Ed.2d 1045 (1973) (prohibition against publi-

cation of discriminatory housing advertisements in newspapers is not a First Amendment violation). Each of these cases involved significant federal policies exemplified in federal enactments of general application as applied to industries otherwise protected by the First Amendment, in contrast to this case. Nor is this case like *United States v. Paramount Pictures Corp.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) in which the court applied the federal antitrust laws to the motion picture industry.

valid and support another, more limited regulation, possibly one more closely resembling the Ohio statute. Judge Duncan's observation, that "delay is a direct result of trade screening, the importance of which to the state's regulatory purposes has been earlier emphasized....," 496 F.Supp. at 435, is applicable to a statute, that, unlike Pennsylvania's, does not prohibit all guarantees and advances, and that does not require that films be "made available" after 42 days to subsequent run theatres, but which, instead, primarily eliminates blind bidding. *This* comprehensive regulation sweeps too broadly and requires more substantial purposes to justify it.

Even if the purposes asserted in Section 2 of the Act were sufficiently "substantial" or "compelling" to justify *some* regulation, the Act is not the precisely drawn enactment that the Court requires. In *Village of Schaumburg v. Citizens For A Better Environment, supra,* 444 U.S. at 636–637, 100 S.Ct. at 836, the Supreme Court held that the village's "75% requirement" could not be sustained unless (1) it served a sufficiently strong interest that the village was entitled to protect and (2) did not unnecessarily (and overbroadly) restrict expression. The village alleged that prevention of fraud was its principal justification (like asserted purpose 7 here, 73 P.S. § 203–2(7)). The Court (Justice White) not only found no substantial relationship between the 75% requirement and any valid goals of fraud prevention, public safety, or residential privacy; it wrote:

> "The Village may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms."

*Id.* at 637, 100 S.Ct. at 836.

*See also Schad v. Borough of Mt. Ephraim, supra,* —— U.S. at ——, 101 S.Ct. at 2184–87, where the Supreme Court reversed convictions for violating that portion of a village zoning ordinance that barred "live entertainment" from the uses permitted in the borough's commercial zones. The borough argued that the purposes of the prohibition were to serve the immediate needs of borough residents and to avoid parking and police problems—normally, valid zoning goals. *Id.* at —— —— ——, 101 S.Ct. at 2184–87. The Court found that the ordinance's purposes were not sufficiently substantial to justify the overly restrictive means used:

> "[W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest.... Similarly, in *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980), it was emphasized that the Court must not only assess the substantiality of the governmental interests asserted but also determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment...."

*Id.* at —— —— ——, 101 S.Ct. at 2182–2184.

If a zoning ordinance that would traditionally survive judicial scrutiny, *see Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), must meet such strict criteria, logically, regulation of bargaining relationships in motion picture licensing, a far less compelling or public state activity, must meet them—even when that regulation is "content-neutral" in contrast to an ordinance prohibiting live entertainment. *Accord: Schneider v. State,* 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) (invalidating restrictions on door-to-door and street distribution of circulars when government's purpose could be achieved less restrictively); *Space Age Products, Inc. v. Gilliam,* 488 F.Supp. 775 (D.Del.1980) (even so valid an objective as elimination of fraud did not justify an overbroad "prior restraint" on plaintiff's First Amendment rights, although the "speech" in question, unlike motion pictures, was mere advertising for a "pyramid" scheme).

The Act's provisions strike too broadly and affect protected rights more substantially than the cases permit. Several examples of its overbreadth are apparent on its

face. For example, assuming *arguendo* that asserted purpose 7 (prevention of "deceptive practices") were deemed both to be "substantial" and a purpose intended by the legislature, a more specific bill mandating advance disclosure or permitting cancellation of a license agreement after screening, or even simply requiring an advance trade screening, would address that issue more directly and with less impact upon protected rights. However, the Act couples prohibitions against guarantees and advances with those against blind bidding, although the affidavits of defendants Budco and Fox argued forcefully that guarantees were undesirable primarily because, if a film were not trade-screened, an exhibitor would not have seen a film before entering into a license agreement in which he guaranteed a return to the distributor.[34] According to defendants' own rationale, the Act is overbroad on its face (and violates the *O'Brien* criteria) when it prevents an exhibitor from offering a guarantee (or an advance) to compete to obtain a picture once advance trade screenings have been required.

Defendants also argue that the Act's restrictions are mere "time," "place," and "manner" regulation, *see Grayned v. City of Rockford*, 408 U.S. 104, 116–117, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) and rely on *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), *reh. denied* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976), for the proposition that mere indirect regulation of the time and place of speech offends no constitutional provision. In their view, requiring advance trade screenings, mandatory rebidding, and reoffers of films after 42 days are reasonable regulations that leave open sufficient alternative channels for communication to avoid unconstitutional restriction. *Young*, however, is not dispositive of this case, nor has it been accorded much weight in subsequent Supreme Court decisions (*see, e. g., Schad v. Borough of Mt. Ephraim, supra,* —— U.S. at ——, 101 S.Ct. at 2184).

First, in contrast to the instant case, which involves the direct regulation of all aspects of the motion picture licensing process, *Young* only restricted the location of certain specific theatres showing sexually explicit "adult" films. Thus, it regulated one narrow aspect of motion picture exhibition that is not involved in this case. By contrast to the regulation in *Young*, the instant Act directly regulates the entire process of licensing of motion pictures for exhibition in theatres in Pennsylvania (and is not concerned with such peripheral First Amendment matters as obscenity).

Second, in upholding the ordinance in *Young* (by a 5–4 vote), the Court emphasized the existence of evidence presented to the lawmakers of neighborhood deterioration due to concentration of the regulated theatres. 427 U.S. at 62, 96 S.Ct. at 2448. There have been no comparable findings here.

Finally, in *Young*, the challenged ordinance merely dispersed the theatres being regulated and had no impact upon the availability of the sexually explicit films. *See* 427 U.S. at 71, n.35, 96 S.Ct. at 2453, n.35. It is questionable whether such provisions as the Act's time limitation on exclusive first runs is comparable to that "dispersal;" it creates the risk of potential economic impact and limiting availability of all types of films.

In *Schad v. Borough of Mt. Ephraim, supra,* the borough, relying on *Young*, argued that its zoning ban on live entertainment was mere "time," "place," and "manner" regulation. It claimed, *inter alia*, that because live entertainment was amply available outside the borough, opportunities for this form of expression had not been restricted (this is comparable to an argument that Section 7, which sets a time limit on exclusive first runs, is constitutional "time," "place," and "manner" regulation because the films will be available in locations other than prime theatres). The Supreme Court rejected that view and, quoting from *Schneider v. State*, 308 U.S. 147,

---

**34.** Fox Affidavit at ¶¶ 4, 5, 7. Thus, Fox speaks of the evils of "the combination of guarantees and not being able to see a film before bidding on or negotiating for it . . . ." ¶ 5.

163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) observed that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Id.* —— U.S. at ——, 101 S.Ct. at 2188.

The Act's provisions directly regulate and affect the licensing process which permits dissemination of expression contained in motion pictures to theatre audiences in Pennsylvania. The Act is not the narrowly drawn regulation that the cases require when First Amendment rights are affected. The Act is not a law of general application. The risks to expression that it creates, although indirect, are apparent on its face. In the absence of compelling governmental interests, directly and precisely served by legislation with a substantial relationship to them, *Village of Schaumburg, supra,* 444 U.S. at 639, 100 S.Ct. 837, its indirect restraints on expression cannot stand, even though they are not phrased as direct regulation of content.

## IV. THE ACT'S INTERFERENCE WITH FEDERAL COPYRIGHT LAW.

The foregoing analysis is, of course, dispositive of this motion. However, because of the importance of this constitutional challenge to a significant state legislative enactment, in which it is claimed that the state enactment interferes with federal law, this opinion will also discuss plaintiffs' Supremacy Clause claim.

Initially, it is important to observe that the case law provides little guidance with regard to the constitutionality of such com-

prehensive regulation of copyright licensing by a state.[35] However, such analogies as exist in the cases and analysis and comparison of the two statutory schemes convince this Court that a conflict impermissible under the Supremacy Clause exists between the Act and federal copyright law.

The issue of whether the Pennsylvania Act must be deemed preempted under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, raises "sensitive issues of state/federal relations....," *Allied Artists Pictures Corp. v. Rhodes, supra,* 496 F.Supp. at 442, and this Court has approached that determination with caution. The often-stated and well-established criteria that govern preemption were summarized in *Jones v. Rath Packing Co.,* 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977), *reh. denied* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240:

> "The first inquiry is whether Congress, pursuant to its power to regulate commerce, U.S.Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case. Where ... the field which Congress is said to have pre-empted has been traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' ... But when Congress has 'unmistakably ... ordained', that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This re-

---

**35.** This Court has carefully examined the cases cited in the parties' briefs and has independently sought for additional authority in this area. There is very little direct case authority on the issue before the court. Those cases in which state action in the copyright area has been stricken deal primarily with conflicting grants of copyright. *See e. g., Mills Music, Inc. v. Arizona,* 591 F.2d 1278 (9th Cir. 1979). *Compare Remick Music Corp. v. Interstate Hotel Co.,* 58 F.Supp. 523 (D.Neb.1944), *aff'd sub nom. Interstate Hotel Co. v. Remick Music Corp.,* 157 F.2d 744 (8th Cir. 1946), *cert. denied* 329 U.S. 809, 67 S.Ct. 622, 91 L.Ed. 691 (1947), *reh. denied* 330 U.S. 854, 67 S.Ct. 770, 91 L.Ed.

1296 (1947), holding that a state law was unconstitutional because it required a copyright holder to offer his property for sale in a certain way and limited his right to fix the terms and the price of a license. *Id.* 58 F.Supp. at 543–4. In *Remick,* failure to comply with the state law resulted in virtual forfeiture of the copyright.

The cases cited by defendants for the proposition that there is no conflict between the state and federal schemes are inapposite in that they deal with application of the antitrust laws or other laws of general application to copyrighted property or to trademarks or with taxes of general application.

sult is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

"Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws with which they conflict. U.S.Const., Art. VI. The criterion for determining whether state and federal law are so inconsistent that the state law must give way is firmly established in our decisions. Our task is 'to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" [citations omitted]

*See also Maryland v. Louisiana*, —— U.S. ——, ——, 101 S.Ct. 2114, 2128, 69 L.Ed.2d —— (1981); *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

The history, purposes and provisions of the 1976 Copyright Act demonstrate that, in this area, Congress has "unmistakably ordained" that federal enactments are to govern.[36] *See* the Notes of the Committee on the Judiciary, House Report No. 94–1476, 94th Cong., 2d Session, 1976, reprinted at pp. 271–72 of 17 U.S.C.A. (1977), U.S. Code Cong. & Admin.News 1976, 5659. To make these intentions enforceable, Congress enacted an explicit statutory preemption section in the 1976 Copyright Act, Section 301(a), 17 U.S.C. § 301(a). That section provides, in pertinent part, that:

"(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state."

Section 301(b) establishes certain exemptions. Significantly, Congress broadened the scope of Section 301(a) from an earlier version (H.R. 4347, 89th Congress, 2d Sess. (1966)) which had provided only that "all rights in the nature of copyright" were preempted and, at the same time, eliminated from the same earlier version of Section 301(b) specific examples of exemptions to the preemption provision, such as breaches of contract or deceptive practices. *See generally* discussion in *Nimmer on Copyright*, ¶ 1.01(b) at pp. 1–10 through 1–19 (1978).

**36.** *See Morseburg v. Balyon*, 621 F.2d 972 (9th Cir.) *cert. denied*, 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980) in which this principle—that whether a particular conflict between state and federal laws will be found tolerable or unconstitutional normally depends upon the relative strength and nature of the federal and state interests involved—recently was discussed. The Court of Appeals rejected the argument that a state transfer tax on royalties should be preempted under the former Copyright Act. The Court observed that when the "area of occupation" is peculiarly federal, or nationwide in its concern, the Supreme Court has emphasized the national interest and has found preemption:

"[C]ertain basic doctrinal notions repeatedly are used in applying preemption. Thus, the extent to which the federal law has 'occupied the field' and the presence of 'conflict' between the federal and state law have always been focuses of analytic attention. The nature of the Court's emphasis at a particular time is re- vealed by whether 'occupation of the field' and 'conflict' are easily found to exist or not. 'Occupation' can require no more than the existence of a federal law generally applicable to a significant portion of the area in question to no less than an express statement demonstrating an intention to occupy the field duly enacted by Congress. 'Conflict' likewise, can require no more than a mechanical demonstration of potential conflict between federal and state law to no less than a showing of substantial frustration of an important purpose of the federal law by the challenged state law." 621 F.2d at 976.

Recently, in *McCarty v. McCarty*, —— U.S. ——, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), the Court held that even in the area of domestic relations, which "belongs to the laws of the States and not to the laws of the United States....," *In re Burrus*, 136 U.S. 586, 593–94, 10 S.Ct. 850, 852–53, 34 L.Ed. 500 (1890), a state's community property laws must give way to federal law as enacted in military retirement statutes.

As defendants correctly point out, the Act does not make recompense to the copyright holder impossible, nor does it establish a conflicting system of state copyright which would obviously be preempted under Section 301. However, as Judge Duncan stated in *Allied Artists*, the standard is whether state legislation "grants, creates, or *destroys*" rights equivalent to those of a copyright. *Allied Artists Pictures Corp. v. Rhodes, supra*, 496 F.Supp. at 443 (emphasis added), and, in certain ways, the Act has that effect. *See* discussion at pp. 993–995, *infra. Compare Remick Music Corp. v. Interstate Hotel Co., supra*, 58 F.Supp. at 543–4.

However, the Court need not find statutory preemption; the more general question of conflict of the two statutory schemes under the Supremacy Clause is decisive. Plaintiffs contend that the Act limits the exercise of federally created rights and, therefore "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz, supra*, 312 U.S. at 67, 61 S.Ct. at 404. Analysis of the purposes and objectives of the Copyright Act and the Pennsylvania Act's impact upon them convinces me that plaintiff's arguments have merit.

To ascertain those purposes, it is necessary, first, to look at the constitutional provision governing copyrights and second, at the Copyright Act itself. Article 1, Section 8, Cl. 8 provides that Congress has the power "[t]o promote the Progress of Science and useful Arts, by securing, for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." This provision makes clear that the public goal—promoting "Science and useful Arts"—is to be served by the means of rewarding the "Author." Furthermore, the legislative history of both the 1976 Copyright Act and its predecessor, as well as the relevant cases decided under both federal Acts, demonstrate that, while the public interest in the dissemination of copyrighted material is, of course, paramount, *Fox Film Corp. v. Doyal*, 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010 (1932), Congress believed that "encouragement of indi-

vidual effort by personal gain is the best way to advance public welfare through the talents of authors...." *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954), *reh. denied*, 347 U.S. 949, 74 S.Ct. 637, 98 L.Ed. 1096 (1954). Thus, in *Goldstein v. California*, 412 U.S. 546, 555, 93 S.Ct. 2303, 2309, 37 L.Ed.2d 163 (1973), *reh. denied* 414 U.S. 883, 94 S.Ct. 27, 38 L.Ed.2d 131 (1973), interpreting the former Copyright Act, the Court explained that "to encourage people to devote themselves to intellectual and artistic creation, Congress may guarantee to authors and inventors a reward in the form of *control over the sale or commercial use* of copies of their works" [emphasis added].

Section 106 of the 1976 Copyright Act, 17 U.S.C. § 106, protects the right of the copyright holder to profit from its creative efforts and governs the way in which a copyright holder may distribute its work to the public and realize the economic benefits of that work. It provides that a holder of a copyright has, among others, the "exclusive rights to do and to authorize any of the following:"

\*　　\*　　\*　　\*　　\*　　\*

"(3) to distribute copies or phono-records of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

"(4) in the case of literary, musical, dramatic and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly...."

The legislative history of Section 106 indicates the importance accorded by the draftsmen of the Copyright Act to the right of the copyright holder to "distribute [his works] ... by rental, lease, or lending...." The notes of the Committee on the Judiciary, House Report No. 94–1476, show that "[t]he five fundamental rights that the bill gives to copyright owners—the exclusive rights of reproduction, adaptation, publication, performance, and display—are stated generally in section 106. These exclusive rights, which comprise the so-called

'bundle of rights' that is a copyright, are cumulative and may overlap in some cases [emphasis added]." 17 U.S.C.A. at 100. Clearly, the Committee viewed the right to license as an essential element of the copyright itself. State regulation that interferes with that right interferes with the essence of the copyright grant and with the achievement of the Congressional objectives.

Furthermore, the same Committee notes make clear the Congressional intent that "the copyright owner would have the right to control the first public distribution of an authorized copy of his work *whether by sale, gift, loan, or some rental or lease arrangement. . . .* [emphasis added]," *id.* at 101, the choice clearly being the copyright holder's.

Although the Pennsylvania Act does not prohibit the grant of a copyright under federal law or establish a competing copyright system or equivalent right under state law, its provisions substantially restrict the conditions under which a copyright holder may distribute and license its work. Its regulation of the conditions under which "rental, lease, or lending" may take place interferes with the federally created rights granted by § 106 and with the copyright holder's "control over the sale or the commercial use. . . ." of its work, *Goldstein, supra,* 412 U.S. at 555, 93 S.Ct. at 2309, in ways that the Ohio statute upheld in *Allied Artists* does not.

For example, Section 6 of the Pennsylvania Act makes unlawful the inclusion of any advances in licenses. By contrast, an exhibitor who wishes to do so may offer an "advance" in Ohio, where a short (14 day) advance is permitted in a license agreement. Thus, while the Ohio statute upheld in Judge Duncan's opinion in *Allied Artists* may not have unconstitutionally limited a copyright holder's control over the commercial use of its work, the Pennsylvania Act goes further.

A second example is the Pennsylvania Act's absolute prohibition of all guarantees in combination with percentage payments. In *Allied Artists,* Judge Duncan recognized

that the Ohio statute merely prohibited the conditioning of a license agreement upon a demand of a guarantee when a percentage rental was sought, unlike Pennsylvania's Act, which prohibits all guarantees outright, and implied that otherwise, he might have come to a contrary decision about the Ohio statute's constitutionality:

"First, plaintiffs assert that the Ohio Act's prohibition of licenses conditioned on guarantees conflicts with the right afforded by copyright owner 'to distribute copies . . . by rental, lease, or lending.' Plaintiffs contend that as a result of this prohibition, the owner of a copyright in a motion picture is faced with the mutually exclusive choices of licensing his film for a fixed price (guarantee) and licensing his film only for a participation in its profits (film rental). Plaintiffs contend that the Ohio Act operates to deny to an artist one of the most basic rights inhering in private property—the right to sell or lease the property for a fixed price reflecting its value to the lessee.

"As a factual matter, the Act does not present the plaintiffs with the Hobson's Choice indicated. By its terms, it does *not* prohibit guarantees; *it merely prohibits conditioning the granting of a license agreement on the payment of a guarantee when a film rental is also sought. The Act merely limits the circumstances under which guarantees may be obtained to situations in which the licensor does not compel the licensee to promise a guarantee as a condition to receiving the license.* Yet in so doing, the Act does restrict the formerly unfettered discretion in producer-distributors to demand payment by guarantees." [Emphasis added]

496 F.Supp. at 445.

In Pennsylvania, the Act poses exactly this "Hobson's Choice."

A third example of interference with § 106 is Section 7 of the Act, which regulates the term of the license—a provision which is not included in the Ohio statute at all. After 42 days, the film must be reoffered for licensing, and the run must be

"expanded." The copyright holder's freedom to license or not to license is directly affected by this section of the Act.

The bidding requirements (also present in Ohio) restrict the licensor's control and freedom to license even further. Once bids are sought, a motion picture license may not thereafter be negotiated privately. Section 8 also requires that bidders be informed of the terms of competitors' bids. Since negotiation may not take place if all bids are rejected, return to the copyright holder is necessarily affected, for on rebidding, competing exhibitors know the terms that were previously rejected. Furthermore, Section 8 prohibits the licensor from withdrawing the film from the market once bidding is initiated and all bids are rejected, further restricting his freedom not to license under the Copyright Act.

In addition, the requirement of Section 4, that an advance screening be held, requires the copyright holder to delay licensing to a time subsequent to the time at which he is permitted to license under the Copyright Act. This requirement, also present in Ohio, conflicts with § 106. *See Kennecott Corp. v. Smith,* 637 F.2d 181, 188 (3d Cir. 1980) (New Jersey Takeover Bid Disclosure Law, delaying "commencement" of a tender offer, conflicted with 5-day waiting period in SEC Rule 14(d)–2, 17 C.F.R. § 240.-14(d)2(b) (1980); *Crane Co. v. Lam,* 509 F.Supp. 782, CCH Fed.Sec.L.Rep., ¶ 97,896 (E.D.Pa.1980) (Pennsylvania Takeover Disclosure Act imposed a time period that conflicted with that in the Williams Act).

These conflicts with the constitutional goals and Congressional intent as it appears in the history of the 1976 Copyright Act are apparent on the face of the Pennsylvania Act. Given the importance of the exclusive right to license, of the right of control and choice of the means of distribution, and the significance of return to the copyright holder, the conclusion that the Act's restrictions "stand as an obstacle" to accomplishment of the Congressional objectives is compelled.

Defendants cite *Fox Film Corp. v. Doyal,* 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010 (1932) for the proposition that reduction of licensing revenues is not unconstitutional in and of itself, and, of course, that general proposition is correct in the abstract. *See also United States v. Paramount Pictures Corp., supra,* 334 U.S. at 158, 68 S.Ct. at 929; *Allied Artists, supra,* 496 F.Supp. at 446–47. But *Fox Film* only holds that a non-discriminatory state gross receipts tax of general application (which this Act is not) may be applied to revenues received from copyright licensing. Its circumstances are not analogous to the Act's direct regulation of licensing terms and its interference with the licensor's control of the commercial use of its work.

Defendants also rely on cases in which state laws of general application regulating conduct found to be against public policy, only peripherally related to copyright licensing or to trademarks, were upheld. *See Watson v. Buck,* 313 U.S. 387, 404, 61 S.Ct. 962, 968, 85 L.Ed. 1416 (1941) (regulating restraint of trade); *Mariniello v. Shell Oil Co.,* 511 F.2d 853 (3d Cir. 1975) (regulating franchise terminations). However, by contrast to the statutes in those cases, the Act directly and exclusively regulates the process of licensing copyrighted property and directly restricts licensing terms in the agreements themselves, such as guarantees, advances, or the period of the license, rather than condemning behavior that contravenes public policy.

The Act's limit upon the duration of the license, upon when a distributor may license, its prohibition of guarantees and advances, and its bar against licensing or negotiations prior to screening, as well as against consummating a license without complying with rebidding requirements, all directly—and severely—restrict the rights of the licensor. If the question before this Court were merely whether "the mere existence of the [Copyright Act] [prohibits] all lawmaking relating to [copyright]...." *Mariniello,* 511 F.2d at 857, another answer would be required. Here, however, the issue is whether the Pennsylvania Act's broad and comprehensive regulation of the process of licensing copyrighted motion pictures conflicts with the objectives of Congress in

its enactment of the Copyright Act. For the reasons stated above, I find that the Act conflicts with Congress' grant of rights under the Copyright Act and "... stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress....," *Jones v. Rath Packing Co.,* *supra,* 430 U.S. at 526, 97 S.Ct. at 1310.

## V.

### THE COMMERCE CLAUSE, DUE PROCESS AND STATE LAW CLAIMS

Because the foregoing analysis is dispositive of plaintiffs' motion, this Court need not decide the remaining constitutional arguments.

### CONCLUSION.

For these reasons, plaintiffs' motion for summary judgment will be granted. An appropriate order will be entered.

This entry of judgment also disposes of plaintiffs' appeal from the Magistrate's Order of September 22, 1980 in plaintiffs' favor. Plaintiffs' motions concerning the counterclaim of Budco Quality Theatres, Inc. will be ruled upon in due course.