

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-27-1999

# Orson Inc v. Miramax Film Corp

Precedential or Non-Precedential:

Docket 97-1994

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Orson Inc v. Miramax Film Corp" (1999). *1999 Decisions.* Paper 111.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/111

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 27, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1994

ORSON, INC. t/a ROXY SCREENING ROOMS

v.

MIRAMAX FILM CORP.,
        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 93-cv-04145)
(District Judge: Hon. J. Curtis Joyner)

Argued September 17, 1998

Before: SLOVITER, SCIRICA and ALITO, Circuit Judges

(Filed April 27, 1999)

        Thomas E. Zemaitis
        Barbara T. Sicalides
        Pepper, Hamilton & Scheetz
        Philadelphia, PA 19103-2799

        Carole E. Handler (Argued)
        Kaye, Scholer, Fierman, Hays
         & Handler
        Los Angeles, CA 90067

         Attorneys for Appellant

Paul R. Rosen
Jeffrey M. Goldstein (Argued)
Spector, Gadon & Rosen
Philadelphia, PA 19103

Richard J. Perr (Argued)
Fineman & Bach
Philadelphia, PA 19103

Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

INTRODUCTION

Section 106 of the Copyright Act provides that, subject to certain exceptions inapplicable here, the owner of a copyright has:

> the exclusive rights to do and to authorize any of the following:
>
> . . .
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; [and]
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly.

17 U.S.C. S 106.

Another section of the same statute provides:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . are governed exclusively by this title.

2

Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. S 301.

Section 203-7 of the Pennsylvania Feature Motion Picture Fair Business Practices Law (the "Pennsylvania Act") provides that:

No license agreement shall be entered into between distributor and exhibitor to grant an exclusivefirst run or an exclusive multiple first run for more than 42 days without provision to expand the run to second run or subsequent run theatres within the geographical area and license agreements and prints of said feature motion picture shall be made available by the distributor to those subsequent run theatres that would normally be served on subsequent run availability.

73 Pa. Cons. Stat. S 203-7.

Appellant Miramax Film Corp., a motion picture production and distribution company, appeals the District Court's failure to overturn a jury's award of damages of $159,780 to plaintiff Orson, Inc., the owner of a Center City Philadelphia (referred to as "Center City") movie theater, for Miramax's violation of section 203-7 of the Pennsylvania Act by entering into an exclusive first-run exhibition agreement for more than forty-two days with another Center City theater. See Orson, Inc. v. Miramax Film Corp., 983 F. Supp. 624 (E.D. Pa. 1997). Miramax argues for reversal on the ground, inter alia, that the Pennsylvania Act is preempted because it interferes with a copyright holder's authority to exercise its exclusive rights to license the work. Before we can address this provocative legal issue, we must first consider Orson's argument that this court has already decided this issue contrary to Miramax's position and that we are bound to reject Miramax's preemption argument by the law of the case doctrine and our own binding precedent.

3

II.

FACTS AND PROCEDURAL HISTORY

This is the second time the parties are before this court in this case. The facts are presented in detail in our first opinion which followed the District Court's grant of summary judgment in favor of Miramax. See Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358 (3d Cir. 1996) ("Orson I"). Nonetheless, we recount the facts necessary for the issue presented here.

Miramax distributes art films nationally, including in Philadelphia and the surrounding metropolitan area. The parties have not attempted to define "art films" other than as we previously did by contrasting them with "movies that may be characterized as `commercial' or `mainstream.' " Id. at 1362. Only a limited number of theaters in any area exhibit art films. Orson showed primarily second-run art films from January 1992 through October 1994 through the Roxy Screening Rooms, a Center City movie theater with two screens. The first runs of Miramax's art films were shown in Center City at the Ritz Theaters, a pair of theaters with five screens each, the Ritz Five and the Ritz at the Bourse (collectively, the "Ritz"). During its two and one-half years of operation by Orson, the Roxy received only one first-run movie from Miramax, and rarely received second-run movies after the forty-second day of play at the Ritz, despite repeated requests.

In August 1993, Orson filed suit against Miramax, charging that Miramax's distribution of films, specifically in its dealings with the Ritz, violated the Sherman Act, the Pennsylvania common law tort of unreasonable restraint of trade, and section 203-7 of the Pennsylvania Act. The District Court granted Miramax's motion for summary judgment as to both Orson's federal and state antitrust claims. It also granted summary judgment to Miramax as to Orson's claim under section 203-7 of the Pennsylvania Act for nine of the fifteen films at issue because it construed that provision as satisfied by Miramax's expansion of the distribution of those films to suburban theaters before the forty-third day of their runs at the Ritz; by agreement of the

4

parties, it dismissed without prejudice Orson's claim as to the six remaining films. Orson, Inc. v. Miramax Film Corp., 862 F. Supp. 1378 (E.D. Pa. 1994). Orson appealed.

This court affirmed the grant of summary judgment to Miramax on the antitrust claim and the restraint of trade claim. Orson I, 79 F.3d at 1358. The principal portion of our opinion was directed to analyzing how the legal principles regarding restraint of trade applied to the arrangement by which Miramax granted the Ritz an exclusive license to exhibit its first-run films. We concluded that "Orson failed to present sufficient evidence to support its claim that the Miramax–Ritz clearances were unreasonable restraints of trade." Id. at 1372.

On the other hand, we vacated the judgment for Miramax on Orson's claim under the Pennsylvania Act because we determined that the District Court had erred in its interpretation of section 203–7. The District Court had construed the statutory requirement that a distributor, such as Miramax, expand the run of the film after forty-two days to other theaters in the "geographical area" to have been satisfied by Miramax's expansion to suburban theaters. We held, in the absence of any applicable opinion by the Pennsylvania Supreme Court, that the relevant geographical area for purposes of section 203–7 was the same area covered by the license, i.e., Center City Philadelphia. Because the record was disputed or incomplete, we remanded for further proceedings as to whether Miramax's actions as to those films violated section 203–7 of the Pennsylvania Act. Id. at 1374–75.

On remand, the case proceeded to a jury trial, and the jury awarded Orson damages of $159,780. See Orson, Inc., 983 F. Supp. at 626. The District Court denied Miramax's post-trial motions. The court held that Orson had presented sufficient evidence to establish that Miramax had caused the injury, that Miramax acted willfully and intentionally, and that the damages were proper. Id. at 634–36.

Additionally, the District Court rejected Miramax's challenge to the constitutionality of section 203–7. The court concluded that Third Circuit precedents had decided the question of the facial validity of the Pennsylvania Act;

moreover, those same precedents "effectively foreclosed" an as-applied challenge. Id. at 630.

Miramax filed a timely notice of appeal. It argues that section 203-7 is unconstitutional on its face and as applied, that the finding of willful and intentional violation is erroneous as a matter of law, and that there was no evidence to support the assumption that the Roxy (Orson's theater) would have exhibited the films after forty-two days. We have jurisdiction pursuant to 28 U.S.C. S 1291.

III.

EFFECT OF PRIOR DECISIONS

We engage in plenary review of a Motion for Judgment as a Matter of Law and apply the same standards as the district court. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Where the issue involves purely a question of law, such as federal preemption, we review the decision of the district court de novo. See Espinal v. Northwest Airlines, 90 F.3d 1452, 1455 (9th Cir. 1996). However, Orson contends that we are foreclosed from examining the legal issue presented because of the law of the case doctrine and the holdings of our prior decisions.

A. Law of the Case

Orson's reliance on the law of the case doctrine need not detain us long. This doctrine precludes a court from reconsidering "issues previously resolved by an earlier panel" in the same case. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 112 F.3d 652, 663 (3d Cir. 1997); see also United States v. Local 560 (I.B.T.), 974 F.2d 315, 329 (3d Cir. 1992) ("When an appellate court decides a legal issue, that decision governs all subsequent proceedings in the same case."). As we stated in Schultz v. Onan Corp., 737 F.2d 339, 345 (3d Cir. 1984), "[T]he law of the case doctrine applies `to issues that were actually discussed by the court in the prior appeal [and] to issues decided by necessary implication." Miramax argues that there was no such discussion the first time this case was before us.

6

Orson's law of the case argument is predicated on a footnote in Orson I stating that this court had already rejected a facial preemption challenge to section 203-7. See 79 F.3d at 1373 n.14. However, an examination of Orson I shows plainly that it did not resolve the legal issues regarding preemption that Miramax raises on appeal.

As we noted at the outset, Orson I was an appeal by Orson from the District Court's grant of summary judgment to Miramax in Orson's suit alleging that Miramax violated the federal antitrust laws, engaged in restraint of trade and violated section 203-7 of the Pennsylvania Act. See Orson Inc., 862 F. Supp. at 1381. On appeal, after we considered and affirmed the grant of summary judgment on the antitrust and restraint of trade counts, we turned to Orson's claims based on section 203-7. Because the District Court had not construed section 203-7 to require expansion after forty-two days in Center City, we remanded for further proceedings because the summary judgment record was either "disputed or incomplete in critical respects." Id. at 1374.

There is no indication in the opinion that we focused on the possibility that we could have avoided the remand if we had decided that the Copyright Act preempted section 203-7. At most, we rather summarily read our prior case law regarding section 203-7 as having decided that issue. We noted Miramax's contention that the federal Copyright Act would preempt section 203-7 if the Act "were interpreted this way," id. at 1373 n.14, but because we believed that we had previously rejected a facial challenge on that ground in two prior cases, see Associated Film Distrib. Corp. v. Thornburgh ("AFD I"), 683 F.2d 808 (3d Cir. 1982), and Associated Film Distrib. Corp. v. Thornburgh ("AFDI II"), 800 F.2d 369 (3d Cir. 1986), we did not discuss it further. Orson I, 79 F.3d at 1373 n.14. Therefore, because the preemption issue was neither actually discussed nor necessarily decided by implication in Orson I -- the only prior decision to which the law of the case doctrine might arguably apply -- we hold that doctrine inapplicable here.

Therefore, we turn to consider Orson's argument that our precedents on the preemption issue now foreclose our review of Miramax's preemption claim.

7

B. Third Circuit IOP 9.1

Orson argues that this court decided in AFD I that
section 203-7 was not preempted by the federal Copyright
Act, and that therefore we are bound to that decision by
our Internal Operating Procedure ("IOP") 9.1.1 That IOP
reflects this court's commitment to "maintain a consistent
body of circuit jurisprudence." A.C.L.U. of New Jersey v.
Schundler, 1999 WL 77766 at *24 n.6 (3rd Cir. 1999).

The complaint in AFD I was filed shortly after the passage
in 1980 of the Pennsylvania Act. That Act comprehensively
regulates several aspects of the licensing, distribution, and
exhibition of films. It requires blind bidding by theaters,
outlines specific procedures for that bidding, prohibits
advances, and strictly curtails minimum guarantees. See
73 Pa. Cons. Stat. SS 203-1-203-6. It also includes the
section at issue here, which provides that no license
agreement between a distributor and an exhibitor can grant
an exclusive first run for more than forty-two days without
provision to expand the run to second-run or subsequent-
run theatres within the geographical area. See 73 Pa. Cons.
Stat. S 203-7. Finally, the Act creates private causes of
action by exhibitors against distributors for violations of its
provisions. See 73 Pa. Cons. Stat. S 203-10. The
Pennsylvania courts have never interpreted the Act's
provisions.

The plaintiffs in AFD I, movie distributors and producers,
filed a motion for declaratory judgment in the United States
District Court for the Eastern District of Pennsylvania
challenging the entire statutory scheme on various
grounds. The District Court granted summary judgment to
plaintiffs on all their claims. See Associated Film Distrib.
Corp. v. Thornburgh, 520 F. Supp. 971, 996 (E.D. Pa. 1981).
The court held that the Pennsylvania Act violated both the
First Amendment by indirectly restraining dissemination of
protected expression, id. at 991, and the Supremacy Clause

_____

1. IOP 9.1 states: "It is the tradition of this court that the holding of
a
panel in a reported opinion is binding on subsequent panels. Thus, no
subsequent panel overrules the holding in a published opinion of a
previous panel. Court in banc consideration is required to do so."

because it was preempted by the federal Copyright Act. Id. at 995-96.

In reaching the latter conclusion, the district court held that certain provisions of the Pennsylvania Act, such as those prohibiting advances, prohibiting guarantees in percentage leases, requiring advance screenings, and requiring certain bidding procedures, interfered with the essence of the copyright grant because the provisions "substantially restrict the conditions under which a copyright holder may distribute and license its work." Id. at 994. The district court recognized that an Ohio district court had upheld the constitutionality of a similar, but not identical, Ohio statute. See Ohio Rev. Code Ann. SS 1333.05-07 (Baldwin 1998). Nonetheless, the district court in AFD I, emphasizing the differences between the Pennsylvania and Ohio laws, viewed the Pennsylvania Act's "broad and comprehensive regulation" to conflict with the federal objectives of the Copyright Act. 520 F. Supp. at 995. The court also concluded that the requirement in section 203-7, requiring that "[a]fter 42 days thefilm must be reoffered for licensing and the run must be `expanded,' " interfered with the copyright holder's freedom to license. Id. at 994-95.

On appeal, this court reversed. AFD I, 683 F.2d at 817. In our discussion, we relied essentially on the analysis detailed both in the Ohio district court opinion reviewing the Ohio statute and in the Sixth Circuit's opinion on appeal. See Allied Artists Pictures Corp. v. Rhodes, 496 F. Supp. 408 (S.D. Ohio 1980), aff'd in relevant part and remanded in part, 679 F.2d 556 (6th Cir. 1982). With respect to the First and Fourteenth Amendment claims,2 we quoted extensively from the Ohio district court opinion, which had rejected the First Amendment challenge, but we stated that because the trial court here had granted summary judgment, it was not able to evaluate the actual impact of the Act, if any, on First Amendment values, it

_____

2. Although the District Court's opinion referred exclusively to the First Amendment, it is established that the Fourteenth Amendment applies the provisions of the First Amendment to the states. See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 n.1 (1996).

9

could not assess the weight of the state's concerns, and it could not make the necessary balance between the distributor's protected rights and the nature and weight of the state's concerns. AFD I, 683 F.2d at 813–14. Accordingly, we remanded the case so that the district court could apply the standards articulated in the Ohio cases to the Pennsylvania Act.

We also decided that the court should not have granted summary judgment on the copyright preemption claim. Again, we relied almost exclusively on the analysis used by the Ohio district court and the Sixth Circuit, which had rejected the similar contentions made there. Id. at 816.

It is significant (and overlooked in our prior opinions) that the Ohio district court, in deciding that the Ohio statute did not create, grant or destroy any rights that are "equivalent" to the exclusive rights of the federal Copyright Act, stated, "Indeed, by providing procedures for the licensing of a film, the Act recognizes sub silentio the right of the copyright owner to exhibit the motion picture and to grant an exclusive or restrictive license to others to exhibit it." Allied Artists Pictures, 496 F. Supp. at 443. The Sixth Circuit agreed with this language, see 679 F.2d at 663, and we quoted it verbatim in AFD I. 683 F.2d at 814–15 n.11. However, as with the First Amendment issue, we concluded that the trial court should not have reached its decision on summary judgment, and we remanded the preemption issue, noting that although the Act on its face contains no threat to the copyrights themselves:

> The question of whether and to what extent the Pennsylvania Act interferes with attaining the "purposes and objectives of Congress" is one which must be resolved before the trial court can decide, as a matter of law, whether the interference (if any) is such as to require invalidation of all or part of the Pennsylvania Act on preemption grounds.

Id. at 816 (emphasis added).

We emphasize that the Ohio statute did not have any limitation on the length of the first run, that the Ohio court on which we relied in AFD I stated that the Ohio statute sub silentio recognized the copyright owner's right to grant

10

an exclusive license to exhibit the film, and that our opinion in AFD I quoted that language about the copyright owner's right to grant an exclusive license to exhibit the film.

As the foregoing discussion makes clear, at most AFD I remanded the legal decision with respect to the 42-day rule, along with the provisions of the Act that we actually discussed in the opinion, so the district court could determine "whether and to what extent the Pennsylvania Act interferes with attaining the `purposes and objectives of Congress.' " Id. at 816. That we did not decide the preemption issue is evident from the statement in the same sentence that this question "is one which must be resolved before the trial court can decide, as a matter of law, whether the interference (if any) is such as to require invalidation of all or part of the Pennsylvania Act on preemption grounds." Id. (emphasis added). If we had decided the copyright preemption issue as a matter of law, there would have been no reason to remand for the trial court to decide the same preemption issue as a matter of law. Indeed, the most direct statement in AFD I regarding section 203-7 -- "particularly with regard to the 42-day provision, the Pennsylvania Act may have a greater impact upon plaintiffs' copyright rights than the Ohio Act," id. at 816 n.12 -- suggests a potential preemption problem with that section.

Surprisingly for a decision on which all the later cases depend, the 42-day rule is never discussed or analyzed in AFD I, undoubtedly because the Ohio statute under discussion in the Ohio district court and the Sixth Circuit opinions on which we relied did not have any comparable provision. Moreover, we cannot regard our decision in AFD I as a legal determination on the preemptive effect of the Copyright Act on section 203-7 because the construction of the requirements imposed by section 203-7 was first given in Orson I, fourteen years after AFD I. Before that case, the district judges had different understandings of the language of that section. See Associated Film Distrib. , 520 F. Supp. at 994-95 ("After 42 days, the film must be reoffered for licensing, and the run must be `expanded.' "); Associated Film Distrib., 614 F. Supp. at 1123-24 ("The statute does

11

not prevent distributors from contracting for runs longer than six weeks. . . . The statute also does not prevent a distributor from entering into a series of exclusive licenses with exhibitors as long as each license does not exceed 42 days."); Orson, Inc., 862 F. Supp. at 1387 (Requirement for expansion after 42 days satisfied because several of the films under consideration " `expanded' to other Philadelphia area theaters, outside of Center City Philadelphia, before the 42-day period expired."). It was not until we reversed the District Court's decision in Orson I that this court provided our definitive construction of section 203-7, viz., that it required the copyright holder to expand its license to another exhibitor within the same geographic area, that is, Center City.

In case after case, courts commented on the vague and uncertain meaning of the statutory language. See, e.g., Associated Film Distrib., 614 F. Supp. at 1111 ("this part of the statute [section 203-7] was inartfully drafted, and distributors interpret its requirements differently"); Orson, Inc., 862 F. Supp. at 1387 (characterizing statute's wording as "sufficiently vague" to permit alternate readings). It would be stretching for us to hold IOP 9.1 applicable in these circumstances. See, e.g., Connors v. Beth Energy Mines, Inc., 920 F.2d 205, 211 n.7 (3d Cir. 1990) (holding IOP 9.1 inapplicable when prior decision predicated on a different record).

Orson may have been misled because we also fell into the same error regarding the precedential effect of AFD I in two later decisions. After the remand in AFD I, the district court, after a six-week bench trial, issued its Findings of Fact and Conclusions of Law in which it upheld the constitutionality of the Pennsylvania Act against all challenges. See Associated Film Distrib., 614 F. Supp. at 1125. This time the distributors appealed, arguing that the Act violated the Commerce Clause (a claim not made in AFD I), violated the First Amendment, and violated the Supremacy Clause because of preemption by the Copyright Act. We rejected the distributors' claims, and affirmed. AFD II, 800 F.2d at 369.

With respect to the copyright preemption issue, we stated that in AFD I we had "conclusively established that the

12

Pennsylvania Act was not facially preempted by the Copyright Act," AFD II, 800 F.2d at 375, and construed our remand to have been for a factual determination by the District Court whether in actual operation the Act prevented or interfered with federally created rights. Id. at 376. We noted that the distributors contended that "the limitation on the length of exclusive runs to 42 days interferes with the copyright owner's right to license exclusively for the life of the copyright," id., and we disagreed with the district court's construction of this provision to mean that the Act "permitt[ed] a distributor to enter into a series of exclusive contracts with the same exhibitor as long as no contract lasted longer than 42 days," id. (citing 614 F. Supp. at 1123-24). In doing so, we reiterated that the language required the distributor " `to expand the run to second run or subsequent run theatres within the geographical area.' " Id. at 377 (quoting 73 P.S. S 203-7) (emphasis in opinion). Thus, although we rejected the district court's interpretation of the Act and emphasized the importance of the term "expand" in doing so, we offered no further opinion as to what the Act affirmatively required.

We recognized "[t]here may be merit" to the preemption issue raised by the distributors but believed our prior opinion in AFD I decided the Pennsylvania Act is not facially invalid. Id. at 377. The writer of that opinion (coincidentally the writer of this opinion) opined that "the 42-day clause is inconsistent with the Copyright Act," id. at 377 n.3, but also believed we were bound by our prior opinion.

As we have demonstrated above, we did not decide the issue whether the 42-day rule is preempted by the Copyright Act in AFD I. This writer concedes she erred in so stating in AFD II. As has been said and oft-repeated, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Bank, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). In any event, it is apparent that our opinion in AFD II cannot be the basis for application of IOP 9.1 because the issue was not actually decided there. And, as we explained earlier in this opinion, in Orson I we relied on the statement in AFD II that the issue had been decided in AFD I.

Accordingly, we believe that Orson is incorrect in arguing that the issue of the preemption of section 203-7 as now construed has previously been decided by this court. We turn now to that issue.

IV.

PREEMPTION

The Supreme Court has recognized three ways in which federal law may preempt, and thereby displace, state law: (1) "express preemption," (2) "field preemption" (which is also sometimes referred to as "implied preemption"), or (3) "conflict preemption." See Pacific Gas & Elec. Co. v. Energy Resources Conservation and Dev. Comm'n, 461 U.S. 190, 204 (1983); International Paper Co. v. Ouellette, 479 U.S. 481, 491 (1987). Express preemption arises when there is an explicit statutory command that state law be displaced. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 382 (1992). An example of express preemption can be found in the subsection of the Employee Retirement Income Security Act of 1974, stating that the provisions of that Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. S 1144(a).

Under field- or implied-preemption principles, state law may be displaced "if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." Cippolone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (internal quotation marks omitted).

Finally, state law may be displaced under conflict-preemption principles if the state law in question presents a conflict with federal law in one of two situations: when it is impossible to comply with both the state and the federal law, see Pacific Gas, 461 U.S. at 204, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).

As the Court has noted, these categories are not necessarily air-tight. See English v. General Elec. Co., 496

14

U.S. 72, 79 n.5 (1990) ("By referring to these three categories, we should not be taken to mean that they are rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.").

The Copyright Act contains an express preemption provision in S 301, which states, in relevant part:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. S 301(a) (emphasis added). The exclusive rights in the copyrighted work granted by the Act are reproduction; preparation of derivative works; distribution by sale, rental, lease or lending; public performance, in the case of motion pictures or audiovisual works; and public display of individual images from motion pictures or audiovisual works. 17 U.S.C. S 106.

State laws, whether statutory or common law, are subject to express preemption under Copyright Act S 301 only if they create rights that are "equivalent" to the exclusive rights within the general scope of copyright. See 17 U.S.C. S 301(a); see also Ehat v. Tanner, 780 F.2d 876, 878 (10th Cir. 1986) (because literary works, including compilations and derivative works, are within the subject matter of copyright, state common law that purported to protect a work for which plaintiff 's copyright action was unsuccessful was preempted); 1 Melville B. Nimmer and David Nimmer, Nimmer on Copyright S 1.01[B][1] (1998) (discussing various state law causes of action).

15

As noted above, conflict preemption may arise either because " `compliance with both regulations is a physical impossibility' or because the state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Jones, 430 U.S. at 525; see also Hines v. Davidowitz, 312 U.S. 52, 67 (1941). The purposes and objectives of Congress, which appear in the Copyright Act, are to implement a nationally uniform system for the creation and protection of rights in a copyrighted work. See Goldstein v. California, 412 U.S. 546, 561 (1973) (turning "to federal copyright law to determine what objectives Congress intended to fulfill").

An illustration of conflict preemption under the Copyright Act is provided by Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 710-11 (1984). That case concerned an Oklahoma state law that banned advertising of alcoholic beverages by cable operators. However, the Copyright Revision Act of 1976 established a program of compulsory copyright licensing under the regulations of the Federal Communications Commission (FCC) pursuant to which a cable operator could transmit signals out of state upon payment of service royalties. The Supreme Court held the Oklahoma law preempted, not only because the FCC had explicitly preempted the area, but also because the state law would destroy or interfere with the exercise of a federally created copyright right. Id. at 710-11; see also 1 Nimmer & Nimmer, supra, S 1.01[B][3]. Cf. Storer Cable Communications v. City of Montgomery, 806 F. Supp. 1518, 1534 (M.D. Ala. 1992) (city ordinance requiring cable programming provider to license programs to additional entities unconstitutional through either S 301 or conflict preemption).

In this case, Miramax argues both express preemption and conflict preemption. In the case before us, we might be able to apply both express preemption and conflict preemption but because our analysis more closely parallels that used in cases applying conflict principles, we proceed on that ground.

In AFD I, in considering the distributors' claim of preemption we adopted the analytical structure previously employed by the Ohio federal courts construing the

16

comparable Ohio statute. AFD I, 683 F.2d at 817. Relying on S 301 of the Copyright Act, the Ohio district court posed the crucial question as "whether the. . . [motion picture] Act creates, grants, or destroys any rights that are `equivalent' to the exclusive rights of copyright set forth in 17 U.S.C. S 106." Allied Artists Pictures Corp., 496 F. Supp. at 443. That court concluded that the Ohio statute did not create rights equivalent to those in S 106, and did not deprive the distributors of copyright protections. Rather, the statute "provid[ed] procedures for the licensing of a film,. . . [and] recognize[d] sub silentio the right of the copyright owner to exhibit and to grant an exclusive or restrictive license to others to exhibit it." Id.

In the same opinion, the Ohio court also rejected the argument that the Ohio statute stood as an obstacle to the federally protected copyright (i.e., conflict preemption), because it viewed the challenged provisions -- a limit on guarantees, a prohibition on negotiations following unsuccessful bidding, a process for bidding with a concomitant ban on blind bidding, and a requirement for a trade screening -- as regulating market practices, rather than the copyright itself. For example, the court observed, the exclusive rights conveyed by a copyright did not authorize a copyright owner to engage in anti-competitive practices in violation of antitrust laws or in fraudulent or deceptive practices. Id. at 447 (citing, inter alia, United States v. Paramount Pictures, Inc., 334 U.S. 131, 156-57 (1948), and Mariniello v. Shell Oil Co., 511 F.2d 853 (3d Cir. 1975)). Instead, the Ohio statute regulated distributors "in order to achieve fair and open bargaining," just as other state market regulations did. Id.

The distribution of motion pictures has been the subject of attention since at least the 1940s when the Department of Justice filed antitrust suits attacking certain practices prevailing within the industry. See generally United States v. Paramount Pictures, Inc., 334 U.S. 131 (1948) (requiring distributors to divest ownership of exhibition theaters). Again, in 1968 the effort of the Department of Justice to correct certain distributors' business practices resulted in stipulations in effect from 1969 to 1975 which restricted the number of blind-bidding films placed on the market by

17

any single distributor. See Allied Artists Pictures Corp., 496 F. Supp. at 417 & n.6; Patrick McNamara, "Copyright Preemption: Effecting the Analysis Prescribed by Section 301," 24 Boston College L. Rev. 963, 990 (1983) (citing United States v. Paramount Pictures, Civ. Action 87-273 (S.D.N.Y. Aug. 14, 1968)).3

The exhibitors and their trade association then lobbied state legislatures to adopt laws that prohibited blind bidding, and nearly half the states did so between 1978 through 1983. See Kathy Herman, Comment, "Anti-Blind Bidding Legislation in the Motion Picture Industry: Associated Film Distribution Corp. v. Thornburgh," 5 J. L. & Com. 293, 299 (1984).

The Pennsylvania Act is one of the most comprehensive of the regulatory statutes enacted in that period. See Associated Film Distrib., 520 F. Supp. at 979 (describing Pennsylvania's Act as "more comprehensive" than "Ohio's comparatively limited regulation"); see also Herman, supra, 5 J. L. & Com. at 304. Its provisions prohibiting blind bidding, prohibiting advances, and limiting minimum guarantees are comparable to regulation by other states of several aspects of the licensing and distribution practices for exhibition of films, and Miramax does not challenge those regulatory provisions before us.

The legislative findings and purposes included in the Pennsylvania Act set forth a litany of the unfair market practices it sought to prevent or ameliorate.4 One of the most egregious practices was that of blind bidding: the marketing and licensing of a film prior to its completion and without offering exhibitors a chance to trade screen the

_____

3. In the mid-1980s, the Department of Justice also proceeded against improper market practices by theater exhibitors themselves. See generally Stanley I. Ornstein, "Motion Picture Distribution, Film Splitting, and Antitrust Policy," 17 Hastings Comm. & Ent. L. J. 415 (1995).

4. These legislative concerns included, inter alia, undue control of exhibitors; restraint, destruction, or inhibition of fair and honest competition; unfair and deceptive acts or practices; and withholding full information regarding prospective motion picture purchases or rentals in a blind-bidding process. See 73 Pa. Cons. Stat. S 203-3.

final product. As a result, distributors could make deceptive claims regarding films offered for bidding. See Associated Film Distrib., 614 F. Supp. at 1107 (discussing the distributors' practice of promoting films based on multiple screen stars who had only cameo roles or who were never seen together in a single scene); see also Allied Artists Pictures, 496 F. Supp. at 429-30 (describing information from distributors as "scant and sometimes misleading"). The Pennsylvania Act prohibits this practice. See 73 Pa. Cons. St. Ann. SS 203-4, -8(b); see also Ohio Rev. Code Ann. S 1333.06(A).

Closely tied to the problem of blind bidding was the unfairness in the bidding process itself which occurred when distributors would unseal closed bids in collusion with a favored exhibitor (the use of "five o'clock looks") in order to enable the exhibitor to offer a sufficiently high bid to obtain the film. See Associated Film Distrib., 614 F. Supp. at 1112 ("Collusion between favorites often controlled the bidding for pictures."); Allied Artists Pictures, 496 F. Supp. at 430. There was even talk that some distributors simply disregarded all the bids and awarded a license to a favored exhibitor. See id.

To curtail these practices, the Pennsylvania Act requires that distributors issue invitations to bid that contain, in addition to the usual information, the names of all exhibitors invited to bid, and the day, time, and location for bid opening. See 73 Pa. Cons. St. Ann. S 203-8(a)-(c); see also Ohio Rev. Code Ann. S 1333.07(A)-(D). Both the Pennsylvania and the Ohio laws also require that exhibitors be able to examine all the bids. See 73 Pa. Cons. St. S 203-8(d); Ohio Rev. Code Ann. S 1333.07(E).5

Another industry practice that Pennsylvania considered ripe for reform was the use of minimum guarantees and advances, see Associated Film Distrib., 614 F. Supp. at 1109-10, which shifted the risks of unsuccessful

_____

5. In Associated Film Distributors, the District Court observed that the Pennsylvania Act "permits oral bid solicitation and oral bids." 614 F. Supp. at 1112. Although the Act does not expressly permit an oral invitation to bid and bidding process, neither does it expressly prohibit either action.

19

exhibitions from distributors to exhibitors, who were required to pay fixed sums in advance of showing. See Allied Artists Pictures, 496 F. Supp. at 418. The provisions of the Pennsylvania Act directed to this practice prohibit minimum guarantee payments if there is also "a fee or other payment . . . based in whole or in part on the attendance or box office receipts," 73 Pa. Cons. St. S 203-5; see also Ohio Rev. Code Ann. S 1333.06(B), and prohibit advance payments in contracts for exhibition. See 73 Pa. Cons. St. S 203-6. But see Ohio Rev. Code Ann. S 1333.06(C) (allowing advances but prohibiting requirement of payment more than fourteen days before theater's first exhibition).

In AFD II, we recognized that statutes that bar exaction of advances from exhibitors, limit guarantees, and regulate the bidding and negotiation process may keep a distributor from achieving the optimal monetary return for the film. See AFD II, 800 F.2d at 376 (citing AFD I, 683 F.2d at 816 (quoting Allied Artists Pictures, 679 F.2d at 662-63)). Nonetheless, we concluded that a reasonable government regulation that seeks to remedy problems caused by the economic disparity that impedes fairness in bargaining and honesty in business dealings is not impermissible merely because it has an economic effect on those regulated.

These regulations do not create a preemption issue because they only "touch copyrighted works indirectly." 1 Nimmer & Nimmer, supra, S 1.01[B][3][c] at 1-65. However, a state regulatory scheme that is "copyright-based in essence" presents a different matter. See id. The 42-day exclusive first-run license limitation in section 203-7 of the Pennsylvania Act is a distinctly different regulation from those within the state's power over improper market practices. If the state's ban on exclusivity after forty-two days directly regulates a right that is protected by federal copyright law, it must, of necessity, be preempted under conflict preemption principles.

Among the "exclusive rights" granted underS 106 in the Copyright Act are the rights to "distribute" and to "perform the copyrighted work publicly." However, section 203-7 requires the distributor to expand its distribution after forty-two days by licensing another exhibitor in the same

geographic area, even if such expansion is involuntary. A distributor who exercises its federal right to grant an exclusive license to an exhibitor of choice will be subject to liability under the Pennsylvania Act for refusing to grant licenses to other exhibitors in the same geographic area after the forty-second day. It is evident that the Pennsylvania Act regulates the essence of the federally protected copyright.

That a copyright encompasses the right to refuse to license was reiterated by the Supreme Court in a decision post-dating AFD I and AFD II, which stated that the Copyright Act grants a copyright owner "the capacity arbitrarily to refuse to license one who seeks to exploit the work." Stewart v. Abend, 495 U.S. 207, 228-29 (1990) (citing Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932)); see also Schnapper v. Foley, 667 F.2d 102, 114 (1981) (vesting "the liberty not to license rights in his work"); Lawlor v. National Screen Serv. Corp., 270 F.2d 146, 154 (3d Cir. 1959) (recognizing corollary right under copyright law to exclude others under licensing right).

In Storer Cable, 806 F. Supp. 1518, the court considered a challenge to a local ordinance that raised a presumption that cable programmers who entered into exclusive licenses for the broadcast of their programming were engaging in proscribed conduct. Although the city defended the ordinance as a legitimate antitrust and pro-competition regulation, the court held it was preempted because "a presumption that exclusive licensing contracts are illegal is . . . not amenable to any saving construction." Id. at 1540. The court noted that "[a] party who holds a copyright for cable programming and who does no more than grant another an exclusive distribution or exhibition license is then in automatic jeopardy of liability as a result of these sections, as is the licensee." Id. at 1539.

Orson argues that once a copyright holder, such as Miramax, makes an initial distribution, a state is free to regulate the manner in which the work is thereafter distributed. We reject Orson's contention. In College Entrance Examination Board v. Pataki, 889 F. Supp. 554 (N.D.N.Y. 1995), the court addressed a New York State law that required the owners of copyrights in certain

21

standardized tests, which were used, inter alia, for graduate school admissions, to file copies of those tests with the State after they were administered. The court held that the New York law improperly interfered with the copyright holders' rights under S 106 because it required reproduction and distribution of the copyrighted tests in the face of the owners' desire not to do so.

Applying a similar analysis in this case, we note that Congress determined that the copyright holder should be granted exclusive rights under S 106, albeit for a limited period. Although a State regulation falling within the federally established exceptions to those rights, such as fair use, see 17 U.S.C. S 107, may obligate a copyright holder to change its practices to accommodate such uses, see, e.g., Association of Am. Med. Colleges v. Carey, 928 F.2d 519, 525-26 (2d Cir. 1991) (remanding to district court to make factual findings on whether existing State law constitutes fair use), the parties here have not suggested, nor can we conclude, that the regulation enacted through section 203-7 falls within one of the Copyright Act's exceptions.

Rather, the Pennsylvania Act, like the New York law regulating standardized tests, would impose on copyright holders, contrary to their exclusive rights underS 106, an obligation to distribute and make available other copies of the work following their initial decision to publish and distribute copies of the copyrighted item. Although it is true, as Orson points out, that the examiners in Association of American Medical Colleges and in College Entrance engaged in extensive efforts to prevent disclosure of their tests, see Appellee Br. at 17 n.10, this factor does not change the fundamental principle that these cases offer: the State may not mandate distribution and reproduction of a copyrighted work in the face of the exclusive rights to distribution granted under S 106.

Even Orson's own quotation of Warner Bros., Inc v. Wilkinson, 533 F. Supp. 105 (D. Utah 1981), appeal dismissed and case remanded, 782 F.2d 136 (10th Cir. 1985), another federal decision discussing an anti-blind bidding statute, supports our distinction between regulations that are designed to assure a fair market and honest business dealings and those that direct a copyright

22

holder to distribute and license against its will or interests. That court stated,

> The right to transfer or license copyrighted material for use by others under sections 106 and 201 et seq. of the Copyright Act has never encompassed a right to transfer the work at all times and at all places free and clear of all regulation; it has meant that the copyright owner has the exclusive right to transfer the material for a consideration to others.

533 F. Supp. at 108 (emphasis added). Nothing in that quotation detracts from the copyright owner's exclusive federal right to decide to whom it will transfer the work. Moreover, the language from the same paragraph serves to support precisely the point made herein; as the Warner Bros. court stated, "No one has appropriated a product protected by the copyright law for commercial exploitation against the copyright owner's wishes." Id. at 108 (emphasis added).

Unlike the provisions in the Pennsylvania Act that are directed to market practices that have no counterpart in the Copyright law, section 203-7 conflicts with the Copyright Act's grant to the copyright holder of an exclusive right to distribute and license a work, and it therefore follows that it is preempted.

V.

CONCLUSION

In conclusion, we hold that because S 203-7 of the Pennsylvania Feature Motion Picture Fair Business Practices Law "stands as an obstacle" to the federally created exclusive rights given to a copyright holder, namely, the exclusive right to distribute the copyrighted work, it is preempted by the federal Copyright Act. Our dictum in AFD I that section 203-7 "may have a greater impact upon [a distributor's] copyright rights," AFD I, 683 F.2d at 816, was prescient.6

_____

6. In light of our conclusion, we need not address Miramax's objections to the trial proceedings.

23

For the reasons set forth above, we will reverse the decision of the District Court denying Miramax's Motion for Judgment as a Matter of Law and directing entry of judgment for Miramax.

24

ALITO, Circuit Judge, dissenting:

The court makes a strong argument that Section 203-7 of the Pennsylvania Feature Motion Picture Fair Business Practices Law, 78 Pa. Cons. Stat. S 203-7 (the "Pennsylvania Act"), is invalid on its face under principles of conflict preemption, but I believe that this argument is foreclosed by the panel decision in Associated Film Distribution Corporation v. Thornburgh, 683 F.2d 808, 816-17 (3d Cir. 1982) ("AFD I"). In my view, Judge Sloviter, writing for the Court, interpreted AFD I correctly in Associated Film Distribution v. Thornburgh, 800 F.2d 369 (3d Cir. 1986) ("AFD II"), when she wrote:

> [T]he earlier decision of this court [" AFD I"] conclusively established that the Pennsylvania Act was not facially preempted by the Copyright Act. At the same time, we recognized that in actual operation the Act might prevent or interfere with the goals of the Copyright Act and remanded for a factual determination by the district court of the Act's actual impact on federally created rights.

Id. at 375-76. Specifically addressing the 42-day provision, Judge Sloviter wrote:

> There may be merit to the distributors' argument that the 42-day provision, when construed as limiting the distributors' right to license an exclusive run to 42 days, is preempted by the Copyright Act. However, such preemption would be apparent on the face of the statute and cannot be reconciled with the court's earlier decision that the Act is not facially invalid under the Copyright Act. . . . [W]e are bound to that position.

Id. at 377.

In a footnote, she added:

> The writer of this opinion believes that the 42-day clause is inconsistent with the Copyright Act. The Copyright Act gives the owner of a copyright the exclusive right to distribute copies of the copyrighted work by rental, lease, or lending. 17 U.S.C. S 106(3); see also M. Nimmer, Nimmer on Copyright S 8.11 at 8-115 (1985). That right encompasses the grant of an

25

> exclusive license for a period as long as the copyright owner desires within the term of the copyright. Nonetheless, she feels compelled to join her colleagues in affirming the district court decision because Internal Operating Procedure 8C of this court [now IOP 9.1] binds subsequent panels to reported panel opinions. Court in banc consideration is required to overrule a published opinion.

Id. at 377 n.3.

I also agree with the way AFD I was interpreted in the earlier appeal in this case. In Orson, Inc. v. Miramax Film, Corp., 79 F.3d 1358, 1373 n.14 ( 3d Cir. 1996), the panel stated:

> [W]e have already rejected a facial challenge to Section 203-7 under the Copyright Act, holding that "the Act on its face contains no threat to copyrights themselves . . . ." Associated Film Distribution Corp. v. Thornburgh, 683 F.2d 808, 816 (3d Cir. 1982), cert. denied, 480 U.S. 933, 107 S. Ct. 1573, 94 L.Ed. 2d 765 (1987); see Associated Film Distribution Corp. v. Thornburgh, 800 F.2d 369, 377 (3d Cir. 1986), cert. denied, 480 U.S. 933, 107 S. Ct. 1573, 94 L.Ed. 2d 765 (1987) . . . .

While I entirely agree with the court that we are not constrained to follow dicta in prior opinions, I cannot reconcile the court's holding in this case with the holding of the prior panel in AFD I. The court's reinterpretation of AFD I is an innovative tour de force, but in the end I find it unconvincing. Accordingly, I respectfully dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit